UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONCERN FOR INDEPENDENT LIVING, INC., | |
| Plaintiff, | Civ. Action No.  24-cv-7101 |
| v. | **COMPLAINT** |
| TOWN OF SOUTHAMPTON, NEW YORK; TOWN BOARD OF THE TOWN OF SOUTHAMPTON, | Jury Trial Demanded |
| Defendants. | |

## INTRODUCTION

1.      This action arises out of the unlawful and discriminatory conduct by the Town of Southampton, New York, and Southampton's Town Board (collectively, "Defendants" or the "Town"), which prevented Plaintiff Concern for Independent Living, Inc. ("Plaintiff" or "Concern") from constructing Liberty Gardens, an affordable housing development in the unincorporated community of Tuckahoe in the Town of Southampton, New York.

2.      Specifically, Defendants blocked Concern's housing because many of the units would be set aside for veterans and others with mental health disabilities and would provide supportive services for them. This conduct violates the Fair Housing Act (FHA), the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and New York's Human Rights Law. The way in which Defendants blocked the project also violated the Town's obligations under the New York State Environmental Quality Review Act (SEQRA).

3.      Congress has explained that the FHA (like Section 504) is a "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with

1

handicaps from the American mainstream," H.R. Rep. No. 100-711, *reprinted at* 1988 U.S.C.C.A.N. 2173, 2179. Similarly, Congress described the ADA as "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see also Olmstead v. L.C.*, 527 U.S. 581, (1999) (describing the ADA's "broad affirmative mandate" for community integration and that "unnecessary institutional segregation of the disabled constitutes discrimination *per se*…").

4.     Defendants' actions in blocking Liberty Gardens prevent the development of community-based housing and services for people with mental health disabilities, thereby making it more likely they will not be able to find a community-based alternative to institutional placement.

5.      In March 2017, the Town of Southampton affirmatively reached out to Concern, identifying an undeveloped parcel behind the Southampton Full Gospel Church (the "Church Parcel") and soliciting an application by Concern to develop on that parcel the type of community-based housing Concern has built in other communities on Long Island. Between that time and June 11, 2024—when the Town Board reversed course and denied the rezoning essential for the development—Concern invested more than $2.5 million in pre-development activities at the site, all of which will be lost in the absence of relief from this Court.

6.     Concern responded comprehensively to every legitimate development issue raised in the course of the Town's lengthy review process, including in the draft environmental impact statement (the "DEIS") and the final environmental impact statement (the "FEIS"), both prepared pursuant to SEQRA.

7.     In the winter of 2023, the Town Board accepted the FEIS, acknowledging that Concern had addressed all issues that had been raised. But then, in the spring of 2024, the Town

Board reversed course and issued a SEQRA Findings Statement contradicting the FEIS and concluding that the project could not move forward because of its environmental impact. The reasoning in the Findings Statement was pretextual and unsupported by the record contained in the DEIS and FEIS.

8.      Defendants describe Southampton as a "high-end resort community … with a strong brand for high-end vacation homes."[1] The median household income in the Town of Southampton in 2022 was $119,181 per year.[2] Some reports suggest that median income has increased substantially since then.[3]

9.      Because of their disabilities, many of Concern's prospective tenants are unable to work and therefore have incomes far below that median. The maximum Supplemental Security Income (SSI) benefits for a disabled person without substantial work history in 2024 (including a modest state supplement) is $12,360 per year (roughly 6% of Town median household income).[4] For people with work history, maximum Social Security Disability Insurance (SSDI) benefits for 2024 total $43,524 per year (roughly 23% of Town median household income).[5]

---

[1] VHB Engineering, Surveying, Landscape Architecture and Geology, P.C., *Housing Plan, Town of Southampton, New York* (May 2022), *available at* https://www.southamptontownny.gov/DocumentCenter/View/26835/Southampton-Housing-Plan---Final-Oct-2022 ("Housing Plan").

[2] Census, *Quick Facts: Southampton town, Suffolk County, New York*, *available at* https://www.census.gov/quickfacts/fact/table/southamptontownsuffolkcountynewyork/POP060210 (last visited Oct. 8, 2024).

[3] DataUSA, *Southampton NY*, *available at* https://datausa.io/profile/geo/southampton-ny/ (last visited Oct. 8, 2024).

[4] Office of Temporary and Disability Assistance, *2024 SSI and SSP Maximum Monthly Benefit Levels Chart* (Oct. 17, 2023), *available at* https://otda.ny.gov/programs/ssp/2024-Maximum-Monthly-Benefit-Amounts.pdf.

[5] NOLO, *How Much in Social Security Disability Benefits Can You Get?* (Mar. 6, 2024), *available at* https://www.disabilitysecrets.com/how-much-in-ssd.html.

10. To ensure affordability for its tenants with limited incomes, Concern has secured funding in excess of $30 million from Suffolk County, New York State Housing and Community Renewal, Federal Home Loan Bank, and the New York State Office of Mental Health, which can be used only at the Church Parcel. Preliminarily, Concern proposed monthly rental rates ranging from $550 per month to $1,371 per month, well below the median rent levels for the Town.

11. There is no supportive housing for people with disabilities in Southampton, effectively precluding many of Concern's prospective residents from living in the community.

12. The Town's own Housing Plan from 2022 confirms the severe lack of affordable and supportive housing in Southampton and recommends that the Town "work to ensure that … disabled populations have options for accessible housing, with support services as needed," and that the Town "monitor compliance with fair housing laws." Housing Plan, at p. 47.

13. In 2017, Town staff approached Concern about constructing an affordable housing development on the Church Parcel, and in October 2018, at the Town's encouragement, Concern filed its pre-application to develop and operate housing for "disabled and low-income persons" and requested a zone change to allow for the kind of density that would make Liberty Gardens economically feasible.

14. Liberty Gardens would help address the need for supportive housing in Southampton and Suffolk County. Concern undertook a years-long planning process for the development, including entering into an option to purchase the Church Parcel, extending that option multiple times at significant expense, engaging an architect and creating a design plan for the community, seeking out necessary financing, and preparing to meet or exceed every requirement of Defendants' zoning ordinance and related regulations.

15.     After several years of due diligence, Concern submitted a DEIS in June 2022. During the ensuing public hearing, dozens of Southampton residents appeared and raised objections to the development that were rooted in discriminatory views about the disabilities of its prospective residents. The FEIS exhaustively addressed all these comments through extensive quantitative studies and descriptions of mitigation efforts. The FEIS concluded that there were no significant, unmitigated, adverse environmental impacts from the project, and the FEIS was accepted by the Town Board in December 2023.

16.     However, in June of 2024, following the 2023 Town Board election, opponents of the project, including Town Board member Cindy McNamara, succeeded in pressuring the Town Board to disregard the evidence in the DEIS and FEIS, unlawfully adopt a contrary SEQRA Findings Statement, and—on the basis of this pretextual Findings Statement—deny the necessary zone change application.

17.     In particular, the Town Board's SEQRA Findings Statement irrationally concluded that the rezoning for Liberty Gardens would have significant adverse environmental impacts and that those impacts could be mitigated only by preserving the site in an undeveloped state or by limiting development to two dwellings per acre. Those "findings" are entirely inconsistent with the DEIS and FEIS, even though as a matter of law the SEQRA Findings Statement must rely on the findings articulated in the FEIS.

18.     The Town Board's Findings Statement is not only factually incorrect and unsupported by the administrative record, but it sets forth grounds for denial that are pretextual. Furthermore—in whole or in part because of the disabilities of the prospective residents— Defendants treated Liberty Gardens substantially more harshly in environmental and land use

review than they had a larger affordable housing complex not designed for residents with disabilities, and that had more substantial environmental impacts.

19.    Defendants' actual reasons for blocking Liberty Gardens arise out of their discriminatory views toward people with mental health disabilities and resistance to lower-cost housing for such residents in a "high-end resort community," and/or to their adoption of, or acquiescence in, those discriminatory views held by community opponents.

20.    Defendants' actions have caused Concern to suffer substantial and irreparable loss and injury. For example, Concern will lose substantial pre-development investments made to identify a suitable parcel for the development, negotiate and draft an option contract, and hire engineers and other consultants to examine the parcel. Concern will lose the benefit of funding commitments that are tied to Liberty Gardens being constructed on the Church Parcel. Concern also suffered damage to its reputation and has had to forgo other opportunities while it focused on the Liberty Gardens development. Moreover, Defendants' actions have caused irreparable injury to veterans and other low-income people with mental health disabilities for whom Liberty Gardens would provide community-based housing and support in a high-opportunity community like Southampton.

21.    Defendants' actions to block Concern's proposed workforce housing development constitute unlawful discrimination against potential residents on the basis of disability in violation of the FHA, ADA, Section 504, and New York's Human Rights Law. Defendants' actions also have the purpose and effect of denying community-based housing to people with mental health disabilities. Those discriminatory actions also constitute unlawful interference with Plaintiff's ability to develop affordable housing. Defendants have also discriminated on the basis of the military status of prospective residents, in violation of New York's Human Rights Law.

22.    Plaintiff seeks a declaratory judgment, injunctive relief, and damages for Defendants' unlawful behavior.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because the action arises under the laws of the United States—the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The Court has supplemental jurisdiction over Plaintiff's New York Human Rights Law and Article 78 claims pursuant to 28 U.S.C. § 1367.

24.    Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202, and 1343, and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

25.    Under 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York because all events and omissions giving rise to Plaintiff's claims occurred in this District and Defendants are incorporated in and reside in this District.

## PARTIES

26.    Plaintiff Concern for Independent Living, Inc., is a non-profit organization founded in 1972 and incorporated in the State of New York. Its mission is to help individuals and families to live in their communities with dignity and enhanced opportunities through the provision of housing and support services. That mission is achieved by developing high quality, attractive housing and providing services to help people with disabilities thrive in the communities of their choice.

27.    Defendant Town of Southampton, New York, is a New York municipality located in Suffolk County. The Town was founded in 1640, consists of approximately 139 square miles, and a has a population of approximately 69,000 residents. It is a unit of local government subject

to the non-discrimination requirements of Title II of the ADA and is a sub-recipient of federal (Community Development Block Grant) funds, making it subject to the non-discrimination requirements of Section 504.

28.     Defendant Town Board of the Town of Southampton ("Town Board") consists of four elected members and an elected Town Supervisor. The Town Board exercises general management and control of Town functions. Under the Code of the Town of Southampton ("Town Code"), the Town Board has exclusive authority to grant or deny proposed amendments to the Town's laws, including zoning law changes.

## FACTUAL BACKGROUND
### Plaintiff's Proposed Liberty Gardens Development

29.     Concern is a non-profit housing agency that develops and operates high-quality, affordable housing with supportive services—also known as "supportive housing"—for people with disabilities and low-income people residing in New York.

30.     Since its founding in 1972, Concern has established a distinguished track record for developing and operating high quality rental housing, with a focus on meeting the needs of families and individuals with mental health disabilities. As of September 2024, Concern operates 1,600 housing units in 275 developments for families and individuals with mental health disabilities.

31.     Concern has received several awards for its work, including the Metropolitan Life Foundation Award for Excellence in Affordable Housing, the Visionary Award from the National Alliance on Mental Illness—New York State, multiple Smart Growth Awards from Vision Long Island, the 2012 Agency of the Year from the National Association of Social

Workers Suffolk Division, the 2016 Key of Excellence from the Long Island Coalition for the Homeless, and the 2018 ERASE Racism Leadership Award.

32.     Originally, the Town itself approached Concern to ask it to develop a project on the parcel in question. In March of 2017, the Town of Southampton's Director of Housing and Community Development, Diana Weir, approached Concern about developing an affordable housing project on an underutilized property owned by the Southampton Full Gospel Church at 130 County Road 39 ("Church Parcel").

33.     The Church Parcel is located in the Town of Southampton in the unincorporated hamlet of Tuckahoe, and a portion of the site is in the Village of Southampton. The overall site is 9.48 acres, including the portion of the property occupied by the church, and the planned development would occupy five acres of the site.

34.     The Church Parcel, which is within walking distance by existing sidewalks of grocery stores, restaurants, and public transportation, was well suited to an affordable housing development.

35.     The Church Parcel sits within the R-20 zone, which allows for a maximum of two dwelling units per acre. When Town officials approached Concern in 2017, the officials knew that it was not possible to build affordable housing in the low-density R-20 zone, and so they knew that any form of affordable housing would require a zone change to provide substantially greater density.

36.     After conducting due diligence, Concern decided to move forward with a proposed development of Liberty Gardens on the Church Parcel.

37.     The Liberty Gardens development would be affordable rental housing, with all units affordable to households earning less than 60% of Area Median Income. For disabled

residents and others with very low incomes, Liberty Gardens would secure monthly rental subsidies so these tenants would not pay more than 30% of their incomes toward rent. While the original proposed development included 60 units, the final proposed development was reduced to 50 units at the Town's request.

38.     Half of the units in Liberty Gardens would be reserved as supportive housing. All individuals served by these units must have a primary diagnosis of serious mental illness per the current edition of the *Diagnostic and Statistical Manual of Mental Health Disorders* and experience substantial impairments in functions due their clinical condition.

39.     Thirteen of the supportive housing units (approximately a quarter of all units) would be reserved for veterans. The remaining supportive housing units would have a preference for veterans in the tenant selection process.

40.     Residents of supportive housing units have access to a variety of supportive services, including self-advocacy training, medication management, symptom management, rehabilitation counseling, socialization, vocational services, substance abuse services, community integration, and more. Staff are available to residents around the clock, either on site or through an after-hours hotline.

41.     Consistent with its commitment to community integration of people with disabilities—a priority articulated in *Olmstead v. L.C.*, 527 U.S. 581 (1999)—all of Concern's services and supports are designed to help residents maintain and expand the life skills necessary to achieve the highest possible level of independence. These services are person-centered and recovery-oriented, providing individuals and families with the means to live with dignity and to become productive members of the community.

### The Need for Affordable and Supportive Housing in Southampton

42.     The need for affordable and supportive housing in Southampton was severe when the Town approached concern in 2017, and it remains severe today. The Town's May 2022 Housing Plan recognizes that "there is a significant mismatch between the population's housing needs, and the housing stock that exists" and, consequently, "households in Southampton are uniquely hard-hit by housing costs."

43.     There is a significant need for subsidized affordable housing in Southampton. While the median income for households in Southampton is high—$119,181 in 2022—nearly 9,000 people in Town (13.1% of the Town's population) live in poverty according to 2023 American Community Survey (ACS) 1-Year Estimates.[6]

44.     The need for subsidized affordable housing is acute for people with disabilities, especially for people with serious mental illness and people experiencing substantial impairments in functioning due to their disabilities, who typically have low or very low incomes according to New York State's Office of Mental Health.

45.     Against this backdrop of need, the Town has very little subsidized affordable housing. According to the United States Department of Housing and Urban Development, Fair Market Rent (FMR) for a studio apartment in Suffolk County is $1,848. For a two-bedroom

---

[6] Census, Poverty Status in the Past 12 Months: Southampton town, Suffolk County, New York, *available at* https://data.census.gov/table/ACSST1Y2023.S1701?q=Southampton (last visited Oct. 9, 2024). Indeed, public officials and housing advocates are not alone in identifying the need for additional affordable housing: employers in Southampton have noted that their employees often cannot afford to live in town and have called for additional affordable housing, as the Housing Plan recognizes.

apartment, FMR is $2,586.[7] As a result of these high rents, more than half of renters in Southampton devote over 35% of their income to housing costs.

46.     Just 1.2% of the housing units in the Town of Southampton are subsidized, and most subsidized units are affordable only to those earning between 80 and 120% of the Area Median Income (or between $95,345 and $143,017 per year). For those earning less than 60% of the Area Median Income—which in 2024 was $58,875 for an individual and $67,320 for a household of four—there are very few housing options in the Town.

47.     Consequently, these populations are unlikely to be able to afford to live in the Town's subsidized affordable housing—let alone the high-priced market rate units that constitute almost all of the Town's housing stock.

48.     The Town also has no supportive housing for people with disabilities, in spite of a significant need for such housing. All individuals living in supportive housing sponsored by New York State's Office of Mental Health must have a primary diagnosis of serious mental illness and experience substantial impairments in functioning in several areas of role performance due to their clinical condition. Supportive housing provides not only shelter to these individuals, but also community integration and services focused on assisting residents to attain the skills necessary to live as independently as possible in the community.

49.     Census data indicates that a significant number of residents in Southampton are eligible for and would benefit from supportive housing. According to 2023 ACS 1-Year Estimates, a significant share of the Town's population are people with disabilities (13.8%),

---

[7] HUD's FMRs are based on the 40th percentile of the market, and so are below the median area rents; most rents in Southampton are higher than those cited here. *See* 24 C.F.R. § 888.113.

people with difficulty living independently (5.3%), people with cognitive difficulties (4.8%), and people with self-care difficulties (2.7%).[8]

50.     The need for supportive housing is particularly acute for veterans. According to reports from the U.S. Department of Housing and Urban Development and the U.S. Department of Veterans Affairs, veterans are disproportionately likely to be homeless, in large part because of high rates of disabilities, such as post-traumatic stress disorder. And according to a 2023 report published by the RAND Corporation, veterans are statistically significantly more likely to suffer from serious psychological distress. Supportive housing addresses these challenges not only by providing veterans with a home, but also by offering support services to veterans who need them.

51.     There is a significant need for supportive housing for veterans in Southampton. Upon information and belief, there are no supportive housing units in Town which are limited or give a preference to veterans.

52.     According to 2023 ACS 1-Year Estimates, there are over 2,700 veterans living in Town (4.8% of the Town's population).[9] Assuming this population resembles the nationwide population of veterans, approximately 187 veterans in the Town of Southampton alone experience serious psychological distress and would therefore benefit from supportive housing targeted at veterans.

---

[8] Census, Disability Characteristics: Southampton town, Suffolk County, New York, *available at* https://data.census.gov/table/ACSST1Y2023.S1810?q=Southampton (last visited Oct. 9, 2024).
[9] Census, Veteran Status: Southampton town, Suffolk County, New York, *available at* https://data.census.gov/table/ACSST1Y2023.S2101?q=Southampton (last visited Oct. 9, 2024).

**Concern's Zone Change Application and Draft Environmental Impact Statement**

53.     After the Town approached Concern, Concern began working on a proposal to develop a project on the Church Parcel with the Town's support, and in October 2018, Concern filed a pre-application with the Town Board seeking a zone change to allow for the development of Liberty Gardens. The pre-application included a conceptual site plan proposing the construction of 60 units spread across six two-story buildings.

54.     To enable the development, the pre-application requested a change of zone from R-20 to MF-44, which allows up to eight dwelling units per dwelling acre. The pre-application further requested an increase in allowable density under Town Code Sec. 330-8, which authorizes the Town Board to permit up to 12 units per acre in the MF-44 zone for low and lower-middle-income housing developed by a non-profit.

55.     The pre-application stated that Concern develops and operates housing for "disabled and low-income persons"; cited Concern's success developing and operating another project serving formerly homeless disabled veterans; and said that the project would create housing for veterans and people with disabilities.

56.     In September 2019, Concern shared a full tax credit application, which outlined the population to be served, with the Town.

57.     After multiple public work sessions, a meeting with the Southampton Citizens Advisory Committee, and a submission of a revised concept plan to address input from residents and the Town, Concern submitted a formal petition for the requested zone changes in June 2020.

58.     Pursuant to SEQRA, Concern submitted an Environmental Assessment Form (EAF) in May 2020 and a Full EAF and Expanded EAF (EEAF) in March 2021. The EAF enables the agency conducting the environmental review (the "Lead Agency") to determine

whether the proposed discretionary actions have the potential to generate any significant adverse environmental impacts. If the proposed actions have the potential to generate a single significant adverse environmental impact, then the Lead Agency must issue a Positive Declaration and the applicant must prepare an Environmental Impact Statement (EIS). If the proposed actions would not have the potential to generate a single significant adverse environmental impact, then a Negative Declaration is issued, no EIS is required, and the environmental review is complete. This step in the SEQRA process is known as the "determination of significance."

59.    In making the determination of significance, SEQRA requires that the Lead Agency use an EAF (or here, an EEAF) to identify the types of potential environmental impacts that the proposed action could generate. Then, the Lead Agency must take a "hard look" at the potential environmental impacts and determine whether to issue a Positive Declaration or a Negative Declaration.

60.    Upon submission of Concern's EEAF, the Town determined that "lead agency coordination" was required under SEQRA, and the Town Board assumed the role of Lead Agency by adoption of a resolution in May 2021. In July 2021, the Town Board issued a Positive Declaration under SEQRA, requiring Concern to prepare and submit an EIS.

61.    Concern participated in a public process of determining the scope of the EIS in order to allow members of the public, as well as other interested agencies, to have input into the Lead Agency's determination as to the proper scope of the EIS. Concern proposed a scope for the EIS designed to address all potential environmental impacts, and a public hearing was held, after which the Town Board adopted a final scope for the EIS in October 2021.

62.    In June 2022, Concern prepared and submitted a Draft EIS (DEIS), a 151-page document addressing issues within that scope, and in July 2022, the Town Board accepted the

15

DEIS as complete for filing, deeming that it complied with the scope set by the Town Board and the requirements of SEQRA.

**<u>Discriminatory Opposition to the Project</u>**

63.    In September and October 2022, the Town Board held two public hearings and received oral and written comments on the DEIS. In total, 68 speakers provided 260 separate verbal comments or questions during the two hearings, and 38 additional written correspondences containing a total of 181 comments or questions were also submitted.

64.    The public commentary included generalized concerns about traffic, the population to be served by the development, SEQRA compliance, density, the impact on natural resources and human health, the impact on community services, and other miscellaneous generalized concerns.

65.    Much of the community opposition to the project focused on the prospective residents of the project. At the October 25, 2022 Town Board meeting, one opponent objected, "This is the building of a secure facility for a compromised population that will be imported here." Other opponents protested, "It will import a large population of people who may not be able to work," and, "It's for people who don't live here."

66.    During this period, Town Councilwoman Cyndi McNamara emerged as a vocal opponent of the project. Prior to the October hearing, McNamara told *The Southampton Press* that she had concerns about the project and its prospective residents. When Concern offered to take her on a tour of other developments they operate to allay her concerns, she refused, suggesting baselessly that Concern would cover up problems caused by residents with mental health disabilities in those developments.

67.     At the October hearing, McNamara objected to the project because it was targeted to people with low incomes and people not already living in Southampton: "None of the 60 units will be for those earning up to 80% of AMI. As a comparison, Sandy Hollow Cove [another affordable housing project in Town] did provide housing opportunities for those making up to 80 percent AMI. . . With higher income thresholds, Sandy Hollow Cove houses local teachers, nurses and first responders in the community." She continued, "Although we are supposed to take on faith that the advertising will target the local area, preference will not be given to Southampton town residents."

68.     McNamara also voiced concern about the disabilities of the prospective residents. She warned that the Town needed to be wary of the effect the project's residents would have on the community because of their psychiatric needs. She further opined that the veterans living in the development would require comprehensive psychiatric emergency treatment and would be a burden on the Town's services. Of course, as described below, the FHA prohibits decision-making based on the disabilities of prospective residents.

69.     Following the close of the public comment period, public opposition to the project continued to grow. In particular, an editorial from *The Southampton Press* titled "Bait and Switch" encouraged the Town Board to reject the project. The piece argued that while "[b]oth the community and town officials reacted favorably" to the initial project, "at some point after that . . . details began to change." The editorial misleadingly continued,

> It was no longer being promoted as workforce housing, but as affordable housing, a subtle but significant difference. The 15 units originally being set aside for veterans morphed into 30 units, or half the development. And they were no longer simply earmarked for veterans but for Vietnam-era veterans with mental health diagnoses, who would require extensive support services—provided by the developer.

17

70.     Although the editorial was incorrect—Concern had notified the Town of Southampton of the supportive housing nature of the project and the unit breakdown in late 2018—it did reflect increasing public awareness of the disabilities of many of the project's prospective residents. The editorial contributed to the growing public pressure opposing the project on the basis of the disabilities of prospective residents.

71.     Over the next several months, the Town's treatment of Concern's application became an issue in the campaigns for Town Supervisor and Town Board. McNamara made her opposition to the project a focal point of her campaign for Town Supervisor. Although McNamara did not prevail in the race, the campaign succeeded in ratcheting up pressure to oppose the project. For example, a debate hosted by *The Southampton Press* during the campaign pressed candidates about their stance on the project, with moderators asking, "Do you think the developers were honest with the town and the community when it was first proposed?" and "Was there a switch there?" As a result of this pressure, Maria Moore—McNamara's opponent who was elected Town Supervisor—did not commit to support the project and ultimately voted to deny the proposed zoning change.

**Concern's Revised Project Proposal and Final Environmental Impact Statement**

72.     In November 2023, Concern and its consultant, Nelson Pope Voorhis, submitted the FEIS to the Town Board. In general, an FEIS consists of any updated or revised environmental analyses, comments on the DEIS from the public and involved or interested governmental agencies, and the responses to comments. Here, the FEIS contained responses to all of the 441 comments or questions raised during the environmental review process, including the most frequently raised concerns, which related to the impact on natural resources and human

health, the population to be served by the development, SEQRA compliance, the impact on community services, traffic, and the density of the project.

73.    Town residents expressed concern that the project would affect potable water quality through placement of its sewage treatment plant. The FEIS included a letter of intent with the Hamptons Center for Rehabilitation and Nursing to allow Concern to pump wastewater offsite to the Center's Sewage Treatment Plan, eliminating the need to construct a sewage treatment plan onsite and addressing concerns associated with such a plan.

74.    Town residents expressed concern that the project would remove natural areas, generate construction noise and pollution, and have a visual impact that disrupts the neighborhood. The FEIS addressed each of these concerns. The FEIS stated that (1) the site does not harbor any rare, threatened, or endangered species or unique habitats; (2) any site development would create temporary construction impacts, none of which would be significant; and (3) development of the site would not be out of character with the neighborhood and would not create any significant adverse visual impacts.

75.    Town residents also raised several questions about who would qualify to live at the development, including questions about income eligibility and whether the local population would be given preference. The FEIS confirmed the eligibility requirements for the project and stated that, consistent with fair housing requirements, it could not restrict eligibility to Town residents. However, based on data from other Concern developments and affordable housing developments in the Town, the FEIS concluded that a majority of the development's residents would be people already living or working in the Town. Moreover, the FEIS stated that Concern would conduct outreach to local groups, including veterans' groups, and engage in locally based marketing to ensure that the development would meet local needs.

19

76.     The Planning Board and Town residents also questioned the project's compliance with SEQRA requirements, including whether the developers considered the cumulative impact of other planned projects, and whether the Town and Village were sufficiently included in the review. The FEIS affirmed that Concern had completed all necessary steps of the SEQRA process, had properly analyzed the project's environmental impacts, including the effect of cumulative effects resulting from other planned projects in Town, and had facilitated and considered community input.

77.     Town residents raised concerns that the proposed development would raise substandard tax revenue relative to community service costs, raise property taxes for local residents, and strain community services, including water, energy, healthcare, waste management, and garbage pickup services. The FEIS concluded that the proposed project would not unduly burden community services and would provide offsetting revenues. These findings were based on an Economic and Fiscal Impact Summary, attached to the FEIS, which outlined the benefits and impacts associated with the project. The Summary noted that the project would generate over $1.5 million in increased revenue for the Town over 30 years because the existing site, under church ownership, was tax exempt.

78.     The Summary acknowledged that the project would generate increased demand on community services relative to the current vacant site, but it noted that that increased demand would also result if the site were developed under the existing zoning. The FEIS further documented extensive outreach conducted with Town departments and local service providers, and based on the information they provided, the FEIS concluded that the project would not have an adverse impact on community services.

79.    Town residents raised concerns about the potential traffic generated by this project, including the potential for more traffic congestion and risk of collisions. The FEIS concluded that the proposed project would not result in an adverse traffic impact at surrounding intersections and roadways. These findings were based on rigorous quantitative traffic impact study conducted for the project and a point-by-point response to questions about the study, including questions raised by the Town's consulting traffic engineer.

80.    Town residents additionally raised concerns that the project would generate high density of units inconsistent with the character of the community and surrounding area. The FEIS stated that the proposed density of the project had been revised from 60 units—the maximum density allowed under the Town Code for affordable housing projects—to 50 units in order to address density-related concerns. The FEIS further noted the character of the project was comparable to that of nearby sites along the same roadway, which includes commercial, institutional, and high-density residential uses. These uses include not only the church at the front of the property, but also a liquor store and beer distributor abutting the property to the east. And the FEIS concluded that the proposed project was consistent with the Town's Comprehensive Plan for the site.

**The Town Board Accepts the FEIS**

81.    On December 27, 2023, the Town Board voted on whether to accept the FEIS and file a Notice of Completion. The vote drew a large crowd, most of whom opposed the project. Several comments focused on the disabilities of the residents and concerns regarding their "mental health issues that will be introduced into our community." Among those who spoke in opposition to the project was Bill Pell (who won a seat on the Town Board that would be seated

in January 2024). Pell's comments were met with large applause by audience members, while a community member expressing support for the project was booed.

82.    After public comment closed, McNamara gave a long speech outlining her opposition to the project, in large part basing it on the fact that the residents of the project were veterans who suffered from mental health disabilities.

83.    McNamara protested that the project might house "veterans with a discharge that is other than honorably discharged." She advised the Board not to be swayed by sympathy for veterans because unsympathetic veterans—those who were not honorably discharged—would be eligible for the project.

84.    McNamara contrasted her opposition to Liberty Gardens with her support for Preserve at South Country Road ("Preserve"), another affordable housing project. Eliminating any doubt about the source of her opposition, McNamara clarified, "When residents say we don't want this type of housing, they aren't talking about affordable workforce housing." Rather, McNamara was opposed to the project because "half of the units in this proposed development are available to those who are unable to remain stably housed due to a mental health diagnosis."

85.    In contrast to McNamara, three members of the Town Board expressed their support for the project and their satisfaction that the FEIS's responses to comments raised about the project were complete and accurate. The Town Board concluded that the FEIS sufficiently addressed all potential environmental impacts associated with the project, including those related to traffic, the population to be served by the development, SEQRA compliance, density, the impact on natural resources and human health, and the impact on community services. The Town Board thus accepted the FEIS, concluding that there were no significant, unmitigated, adverse environmental impacts.

86.     At the end of the December 27, 2023 meeting, the Town Board voted to accept the FEIS and file a Notice of Completion under SEQRA by a vote of 3-2.

**<u>Southampton's Discriminatory Denial of the Zone Change Application</u>**

87.     Under SEQRA, the final step in the environmental review process is the adoption by the Lead Agency of a findings statement. The findings statement must be consistent with the factual record, and any conclusions regarding environmental impacts must be consistent with the FEIS or otherwise supported by record evidence. The findings statement must identify any significant adverse environmental impacts and measures that mitigate in whole or in part those impacts. If there are any unmitigated significant adverse environmental impacts, the Findings Statement balances their negative consequences against the social and economic utility of the proposed action. If an FEIS concludes that a proposed action would not have the potential to generate any significant unmitigated adverse environmental impacts, then the Findings Statement must be consistent with that conclusion.

88.     As a result of the November 2023 election, in January 2024, two of the three members of the Board who had voted to approve the FEIS were replaced by new Board members who would ultimately vote against the project.

89.     Following the seating of the new Board members, Concern granted multiple extension requests to allow the Board additional time to issue its Findings Statement.

90.     Over the next few months, Concern met and corresponded with Supervisor Moore to address concerns about the project. In response to a suggestion from Moore that Concern look to develop alternate sites, Concern informed Moore that the funding was specific to the Church Parcel and could not be transferred to other sites. Concern also informed Moore that because of

this and other issues—including the pre-development costs incurred at the Church Parcel and environmental concerns at other sites—the alternatives Moore suggested were not viable.

91.     Upon information and belief, Town staff prepared a draft Findings Statement that was consistent with the conclusions in the FEIS and concluded that the project would not have generated any unmitigated significant adverse environmental impacts. A majority of the Town Board refused to process that draft and instead required the Findings Statement to depart from the factual conclusions in the FEIS and state contrary conclusions without any support in the record.

92.     On June 11, 2024, the new Board issued its findings statement ("Liberty Gardens Findings Statement" or "Findings Statement"). The Liberty Gardens Findings Statement concluded that the proposed rezoning would have significant environmental impacts and that those impacts could only be mitigated by preserving the site in an undeveloped state or by limiting development to two dwellings per acre. As described below, those findings were unsupported by the uncontroverted evidence in the FEIS.

93.     The Board's decision to issue findings that were inconsistent with the FEIS is a stark departure from the Board's ordinary practice. Upon information and belief, the Town Board normally issues findings statements whose environmental conclusions are consistent with the conclusions and analyses in the FEIS, the DEIS, and the record before it. This is the same practice undertaken by governmental agencies generally, all of which are required to issue findings statements containing environmental findings that are consistent with the evidence in the record, which is contained in the DEIS and FEIS as to projects for which and EIS has been prepared.

94.    On June 11, 2024, the Town Board also passed a resolution by a 4-1 vote adopting the Findings Statement and, on that basis, denied Concern's zone change application in its entirety.

**The Purported Environmental Impacts from the Project Are Pretextual**

95.    When a proposed project requires an EIS, SEQRA requires the lead agency to issue a findings statement "consider[ing] the relevant environmental impacts, facts and conclusions disclosed in the final EIS"; "weigh[ing] and balance[ing] relevant environmental impacts with social, economic and other considerations"; and "provid[ing] a rationale for the agency's decision." 6 CRR-NY 617.11(d)(1)-(3).

96.    The lead agency must also certify that its ultimate conclusions as to the proposed action are "consistent with social, economic and other essential considerations," and that "from among the reasonable alternatives available, the action is one that avoids or minimizes adverse environmental impacts to the maximum extent practicable." 6 CRR-NY 617.11(d)(5).

97.    Here, contrary to the FEIS and without relying on any other record evidence, the Liberty Gardens Findings Statement claimed that the proposed development would have significant adverse impacts on (1) drinking water resources; (2) ecological processes; (3) the Town's land use objectives; (4) demand for community services, including police, ambulance, public education, and public water; (5) traffic; (6) the residential character of the surrounding community; and (7) "other impacts," such as construction-related impacts and energy usage.

98.    The Findings Statement further concluded that only two alternatives mitigated those identified impacts to the maximum extent practical: (1) the "no build" alternative, under which nothing would be built on the site; and (2) the "as of right" alternative, under which

development would proceed consistent with the existing zoning allowing two dwelling units per acre.

99.     Because the FEIS had demonstrated that there were in fact no significant adverse environmental impacts, there was no need to consider other alternatives. Moreover, to the extent the Board did consider any environmental impacts to be relevant, it was required to base those concerns on record evidence, and weigh them against "social, economic and other considerations." It did neither.

100.     As described above, the FEIS had addressed each of the potential environmental impacts with extensive quantitative studies and detailed explanation of mitigation steps Concern had taken. The Findings Statement contradicted that evidence, but it did not identify any evidence to the contrary.

101.     There is no record evidence that the proposed development would have a significant adverse impact on drinking water resources. As stated in the FEIS, Concern addressed this issue by negotiating an agreement with the Hamptons Center for Rehabilitation and Nursing to allow Concern to pump wastewater to offsite to the Center's Sewage Treatment Plant.

102.     There is no record evidence that the proposed development would have a significant adverse impact on ecological processes relative to the no build and as of right alternatives. As the DEIS and FEIS point out, the site does not harbor any rare, threatened, or endangered species or unique habitats, and the site is not preserved as open space. Any development of the site—whether under the existing zoning, which allows for subdivision into several residential lots, or the proposed change of zone—would result in clearing of woodlands and disturbance of the ecology on the site. Further, the small size of the site (5 acres) belies the significance of this concern.

103.    There is no record evidence that the proposed development would have a significant adverse impact on the Town's land use objectives or on the residential character of the surrounding community relative to the no build and as of right alternatives. As the FEIS explains, the project is compatible with surrounding uses, which include a church and a liquor store, and with the Town's Comprehensive Plan. Indeed, the fact that Town staff invited Concern to develop a multifamily affordable housing development on the exact site in question affirms its suitability for the proposed density.

104.    There is no record evidence that the proposed development would have a significant adverse impact on demand for community services relative to the no build and as of right alternatives. The Findings Statement does not specifically estimate the effects on police, fire, and ambulance services nor does it include any evidence about the impact on those services under the no build and as of right alternatives. The Findings Statement does include a quantitative assessment of the fiscal impact on the school district, but the projected impact is wrongly based on the 60-unit proposal, not the revised 50-unit proposal. More importantly, the DEIS and FEIS make clear that the expected yield of school-aged children from the project is six—two *fewer* children than the projected yield under the as-of-right alternative.

105.    There is no record evidence that the proposed development would have a significant adverse impact on traffic relative to the no build and as of right alternatives. Based on a rigorous quantitative study, the FEIS concluded that the project would not have an adverse traffic impact. In response to this informed analysis, the Findings Statement nakedly asserts that "it is empirically obvious to everyone in the Town that the existing traffic on County Road 39 is now at untenable levels," without citing any countervailing data or analysis. Though the Findings Statement generically cites concerns raised by the Town's consulting Traffic engineer with the

27

traffic impact study at the DEIS stage, it does not respond to or engage with the point-by-point response to those concerns reflected in the FEIS.

106.    There is no record evidence that the proposed development would have other significant adverse impacts relative to the no build and as of right alternatives. The remaining concerns reflected in the Findings Statement—including construction-related impacts, cumulative impacts, energy use, etc.—are not substantiated by any evidence or analysis at all. Moreover, these impacts are incidental to the project and would be incurred by any development of the property under the as-of-right alternative.

107.    The pretextual nature of these environmental findings is clear from the Board's treatment of another proposed development that did not plan to provide housing for people with disabilities.

108.    In 2021, NRP Group submitted a change of zone application to the Town Board that would allow for a multi-family affordable housing development, Preserve, for people earning up to 80% of the Area Median Income.

109.    The Preserve application was like Liberty Gardens in all relevant respects except one: Preserve did not limit eligibility for any units to veterans or people with disabilities.

110.    The issues identified in the environmental impact statements for the Preserve project are strikingly similar to those identified in the environmental impact statements for Liberty Gardens, and the impact statements for both projects were prepared by the same firm.

111.    A review of the environmental impact statements for both projects makes clear that the Preserve project would have an equal or greater impact on drinking water resources, ecological processes, the Town's land use objectives, demand for community services, traffic, the residential character of the surrounding community, and other outcomes.

112.    Despite the presence of these issues, the Town Board issued a Findings Statement for the Preserve project ("Preserve Findings Statement") which found that the Preserve project avoided or mitigated environmental impacts to the maximum extent practical.

113.    Based on the Preserve Findings Statement, the Town Board approved the change of zone application, allowing a development with 79 units to move forward. The Town Board's findings and change of zone approval were both approved unanimously, with the support of McNamara.

114.    Although (1) Preserve would generate 7,052 more gallons per day of wastewater than Liberty Gardens, and (2) Liberty Gardens did not require building a new sewage treatment plant, while Preserve did, in contrast to the Liberty Gardens Findings Statement; the Preserve Findings Statement nevertheless found that the project would not have a significant adverse impact on drinking water resources.

115.    And even though Preserve required clearing 10.7 acres of natural vegetation, while Liberty Gardens required clearing just 4.5 acres of natural vegetation, the Preserve Findings Statement found that the project would not have a significant adverse impact on ecological resources, while the Liberty Gardens Findings Statement found that it would.

116.    Although both Liberty Gardens and Preserve further the Town's affordable housing goals, only the Preserve Findings Statement found that the project would not have a significant adverse impact on the Town's land use objectives because it would help the Town achieve its affordable housing goals.

117.    And even though Preserve would yield 24 school-aged children, *four times* the projected yield from Liberty Gardens, the Preserve Findings Statement found that the project would not have a significant adverse impact on community services, while the Liberty Gardens

Findings Statement found that school-aged children from that development would "become[] the burden of the surrounding community."

118.    While the Preserve and Liberty Gardens traffic studies used the same methodology, the Preserve Findings Statement credited the traffic study's conclusion that the project would not have a significant adverse impact on traffic, while the Liberty Gardens Findings Statement, rejected the traffic study's conclusion that Liberty Gardens would not have a significant adverse traffic impact.

119.    Even though Preserve was a larger project with more buildings that required clearing far more woodlands than at Liberty Gardens and was surrounded by single-family homes while the Liberty Gardens site abuts a church and liquor store, the Preserve Findings Statement found that the project would not have a significant adverse impact on the residential character of the surrounding community, while the Liberty Gardens finding reached the opposite conclusion.

120.    Without any basis for distinguishing, the Preserve Findings Statement accepted that the construction impacts from Preserve would be temporary and limited, while the Liberty Gardens Findings Statement stated that the construction impacts from Liberty Gardens were unacceptable.

121.    As the foregoing paragraphs makes clear, the Board's dissimilar treatment of the Liberty Gardens application was not based on legitimate environmental considerations, but on the fact that Liberty Gardens would serve people with mental disabilities and veterans.

**INJURY TO PLAINTIFF**

122.    Defendants, individually, directly, and/or through their agents, have engaged in discrimination against Concern on the basis of the disabilities and the military status of Concern's clients.

123.    Each Defendant was the actual or apparent agent, employee, manager or representative of each of the other Defendants. Each Defendant, in doing the acts as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies; or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.

124.    Defendants have acted intentionally and willfully, with callous and reckless disregard for the statutorily protected rights of Plaintiff, people with disabilities, and veterans in need of affordable housing opportunities, largely in response to Town residents. Town officials acted in response to Town residents' vocal opposition to Plaintiff's proposed development. Through public statements, letters, posts, and other means, Town residents and officials made their discriminatory positions clear: they opposed the proposed development because it would serve people, including veterans, with mental health disabilities.

125.    As a proximate result of the acts and practices described above, Plaintiff has suffered, continue to suffer, and will suffer in the future, great and irreparable loss and injury, including but not limited to, economic losses; a deprivation of Plaintiff's right to develop affordable housing for people with disabilities and veterans that is integrated into the community and free from discrimination; and interference with Plaintiff's attempts to provide safe and affordable housing for new and existing residents of the Town of Southampton. Defendants' actions also injure the intended beneficiaries of Plaintiff's proposed affordable housing development.

126.    After the Town invited Plaintiff to develop the site, Plaintiff expended substantial time and resources. Plaintiff paid to negotiate, draft, and enter an option to purchase contract, but with the denial of the zone change application, Plaintiff cannot use the property for the purpose of developing the project, and therefore, cannot exercise the option to purchase in an economically sensible manner.

127.    Plaintiff invested significant funds in pre-development activities, including retaining a land use attorney to apply for the change zone, hiring the firm Nelson Pope Voorhis to conduct extensive environmental review of the project, hiring architectural firm H2M, and paying significant fees to maintain the option to purchase the subject property.

128.    Plaintiff and its owners and officers have lost opportunities to build similar projects on different parcels in another jurisdiction because they invested their time and resources in the Liberty Gardens project. Plaintiff and its owners and officers have also been unable to pursue other projects that would have been their focus if they had not expended their time on developing the project.

129.    Defendants' discriminatory conduct has caused harm to Plaintiff's business reputation. In particular, any developer who takes a parcel off the market through an option to purchase contract, but fails to actually exercise the option, is less likely to find willing sellers in the future. This exacerbates the existing difficulty of there being few owners of suitable parcels who are willing to enter into the type of contingent contract necessary for a LIHTC project.

130.    Defendants' discriminatory conduct has frustrated Plaintiff's mission to help individuals and families to live in their communities with dignity and enhanced opportunities through the provision of housing and support services. Plaintiff's mission was perceptibly impaired because Defendants' opposition to Liberty Gardens prevented Plaintiff from providing

affordable and supportive housing to individuals and families in Southampton who desperately needed it.

131.    The loss of housing opportunities for a disproportionate number of people with disabilities and veterans due to unlawful discrimination constitutes an irreparable harm to those groups. Plaintiff's development of affordable and supportive housing project would provide desperately needed affordable housing to people with mental disabilities, including veterans suffering from such disabilities.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

132.    Plaintiff realleges and incorporates by reference all above paragraphs, as if fully set forth herein.

133.    Defendants' actions described in this Complaint amount to unlawful disability discrimination in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq*. In passing the FHA, Congress explicitly called for an end to zoning restrictions that limit housing opportunities for people with disabilities to live in communities and rejected the idea that assumptions and misunderstandings about prospective residents with disabilities could serve as a legitimate basis for adverse action or exclusion.

134.    The FHA "is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." The statute "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations

about threats to safety are specifically rejected as grounds to justify exclusion . . . ." H.R. Rep. No. 100-711, *reprinted at* 1988 U.S.C.C.A.N. 2173, 2179.

135.    Plaintiff is associated with individuals who have "handicaps" within the meaning of the FHA, 42 U.S.C. § 3602(h).

136.    Defendants injured Plaintiff in violation of the FHA by committing the following discriminatory practices:

a.    Discriminating or otherwise making housing unavailable because of a disability, in violation of 42 U.S.C. § 3604(f)(1);

b.    Discriminating in the terms, conditions, and privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2);

c.    Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on disability, or an intention to make any such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c); and

d.    Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the FHA, in violation of 42 U.S.C. § 3617.

137.    Defendants' acts in violation of the FHA caused Plaintiff's injuries as detailed above.

138.    Defendants' actions to block Plaintiff's proposed affordable housing development are and have been based on discriminatory motives related to the disabilities of the likely tenants of the proposed community.

139.    Defendants' actions also impose disproportionate harms on people with disabilities, particularly people with independent living difficulties in need of supportive housing, by making affordable, supportive housing in Southampton unavailable to this group.

140.    Defendants' actions were intentional, wanton, malicious, and done in reckless disregard of the civil rights of Plaintiff and its clients.

## SECOND CAUSE OF ACTION

### Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

141.    Plaintiff realleges and incorporates by reference all above paragraphs, as if fully set forth herein.

142.    Defendants discriminated and continue to discriminate on the basis of disability in violation of Title II of the ADA by acting in a manner that, among other things:

a.  Denies meaningful access to community-based housing for people with mental health diagnoses in the Town of Southampton.

b.  Aids or perpetuates discrimination against people with mental health diagnoses.

c.  Uses methods of administration that discriminate against people with mental health diagnoses by failing to ensure that such people have meaningful access to housing in the Town of Southampton.

d.  Otherwise limits people with mental health diagnoses from enjoying housing or the opportunity to obtain such housing in the Town of Southampton by engaging in the policies, practices, acts, and omissions described above.

143.    As a result of the discrimination alleged in the previous paragraph, Plaintiff has sustained the injuries described herein.

### THIRD CAUSE OF ACTION
### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

144.    Plaintiff realleges and incorporates by reference all above paragraphs, as if fully set forth herein.

145.    Defendants discriminated and continue to discriminate on the basis of disability in violation of Section 504 of the Rehabilitation Act by acting in a manner that, among other things:

a.  Denies meaningful access to community-based housing for people with mental health diagnoses in the Town of Southampton.

b.  Aids or perpetuates discrimination against people with mental health diagnoses.

c.  Uses methods of administration that discriminate against people with mental health diagnoses by failing to ensure that such people have meaningful access to housing in the Town of Southampton.

d.  Otherwise limits people with mental health diagnoses from enjoying housing or the opportunity to obtain such housing in the Town of Southampton by engaging in the policies, practices, acts, and omissions described above.

146.    As a result of the discrimination alleged in the previous paragraph, Plaintiff has sustained the injuries described herein.

### FOURTH CAUSE OF ACTION
### New York Human Rights Law, N.Y. Exec Law § 296

147.    Plaintiff realleges and incorporates by reference all above paragraphs, as if fully set forth herein.

148.    Defendants' actions described in this Complaint amount to unlawful discrimination against people with disabilities and veterans in violation of the New York Human Rights Law, N.Y. Exec. Law Article 15 § 290 *et seq*.

149.    Plaintiff is associated with individuals who have a "disability" within the meaning of the New York Human Rights Law, N.Y. Exec. Law Article 15 § 292.

150.    Defendants injured Plaintiff in violation of the Human Rights Law by committing the following discriminatory practices:

a.   Discriminating or otherwise making housing unavailable because of disability and/or military status, in violation of N.Y. Exec. Law Article 15 § 296(5)(a)(1);

b.   Discriminating in the terms, conditions, and privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability and/or military status, in violation of N.Y. Exec. Law Article 15 § 296(5)(a)(2);

c.   Making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on disability and/or military status, or an intention to make any such preference, limitation, or discrimination, in violation of N.Y. Exec. Law Article 15 § 296(5)(a)(3); and

d.   Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act, in violation of N.Y. Exec. Law Article 15 § 296(6).

151.   Defendants' acts in violation of the Human Rights Law caused Plaintiff's injuries as detailed above.

152.   Defendants' actions to block Plaintiff's proposed affordable housing development are and have been based on discriminatory motives related to the disabilities of the likely tenants of the proposed community.

153.   Defendants' actions also impose disproportionate harms on people with disabilities, particularly people with independent living difficulties in need of supportive housing, by making affordable, supportive housing in Southampton unavailable to this group.

154.   Defendants' actions were intentional, wanton, malicious, and done in reckless disregard of the civil rights of Plaintiff and its clients.

## FIFTH CAUSE OF ACTION
### Article 78 Challenge to the Findings Statement

155.   Plaintiff realleges and incorporates by reference all above paragraphs, as if fully set forth herein.

156.   This challenge to the legality of the Findings Statement is brought pursuant to New York Civil Practice Law and Rules Article 78, specifically seeking review similar to the common law writ of certiorari. Relief is sought as well pursuant to the Court's authority to compel compliance with non-discretionary requirements of law, similar to the common law writ of mandamus to compel.

157.   As Lead Agency, the Town Board is required to strictly comply with the procedures mandated by SEQRA and its implementing regulations.

158.   Since the Town Board, as Lead Agency, issued a Positive Declaration, preparation of an EIS was required.

159.    The Town Board engaged in public scoping and the DEIS was prepared and accepted by the Town Board as being consistent with the required scope of the environmental review.

160.    Following the Town Board's acceptance of the DEIS, the Town Board scheduled a public hearing on the DEIS, pursuant to which both oral and written comments were received.

161.    Prior to the preparation of the FEIS, the proposed project was modified as follows, as set forth in FEIS § 1.4.1:

a.  The size of the project was reduced from a total of 60 residential units to 50 units through the removal of a 10-unit two-story building; and

b.  The originally proposed sewage treatment plant was replaced with a pump station that would pump sewage to an existing off-site sewage treatment plant.

162.    The changes to the proposed development reduced its potential adverse environmental impacts.

163.    All substantive comments submitted on the DEIS were responded to in the FEIS.

164.    Nowhere in the FEIS is there a statement that the proposed action, as modified per FEIS § 1.4.1, would have the potential to generate a single significant adverse environmental impact.

165.    Since the FEIS does not contain any analysis concluding that the Project had the potential to generate any significant adverse environmental impacts, no mitigation measures were identified or analyzed in the FEIS.

166.    As Lead Agency, the Town Board accepted the FEIS in December 2023.

167.    The Town Board was required under SEQRA to issue a Findings Statement to conclude the environmental review process.

168.    Subsequent to the acceptance of the FEIS, the Town Board did not require preparation of an amended FEIS or a supplemental EIS.

169.    On information and belief, the Town Board rejected a draft Findings Statement prepared by Town staff that was consistent with the environmental analyses and conclusions in the DEIS and FEIS. Instead, the Town Board's adopted Findings Statement was inconsistent with the environmental analyses and conclusions in the DEIS and FEIS.

170.    Specifically, the Findings Statement contradicts the DEIS and FEIS by finding that the proposed development would generate significant adverse environmental impacts on (1) drinking water resources; (2) ecological processes; (3) the Town's land use objectives; (4) demand for community services, including police, ambulance, public education, and public water; (5) traffic; (6) the residential character of the surrounding community; and (7) "other impacts," such as construction-related impacts and energy usage.

171.    The DEIS and FEIS did not identify a single significant adverse environmental impact that would arise from the development, including as to each of the subject areas referenced in the prior paragraph.

172.    The Town Board, as Lead Agency, is required under SEQRA and its implementing regulations, to adopt a Findings Statement whose determinations regarding environmental impacts are consistent with the analyses and conclusions in the DEIS and FEIS and supported by the factual record.

173.    The Town Board acted arbitrarily, capriciously, without reasonable basis, and contrary to law in adopting the Findings Statement contradicting the conclusions in the DEIS and FEIS without citing any evidence to the contrary and finding that the proposed development would generate significant adverse environmental impacts.

174.    Accordingly, the Court should annul and vacate the Findings Statement.

175.    The Court should issue an order of mandamus compelling the Town Board, as Lead Agency, to issue a new Findings Statement that is consistent with the analyses and conclusions in the DEIS and FEIS.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(a)    enter a declaratory judgment that the actions of Defendants complained of herein are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601–3631; the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and New York's Human Rights Law;

(b)    issue a preliminary and permanent injunction restraining Defendants, their agents, employees, representatives, and successors, or any other person acting directly or indirectly with them from unlawfully interfering with Plaintiff's development and from taking any further action that would hinder, delay, or obstruct the Plaintiff's development of the proposed affordable housing community, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including, but not limited to, issuance of a SEQRA Findings Statement that is consistent with the DEIS and FEIS, and approval of the Liberty Gardens change of zone application;

(c)    award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the loss that has been caused by the conduct of Defendants alleged herein;

(d)    award punitive damages in an amount to be determined by the jury;

(e)    award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 3613(c)(2); and

(f)    order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues in this

case.

Dated: October 9, 2024

/s/ Edward Olds
Edward Olds
Michael Allen*
Rebecca Livengood*
Edward Olds
Valerie Comenencia Ortiz*
Relman Colfax PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
Tel: (202) 728-1888
Fax: (202) 728-0848

/s/ Steven Barshov
Steven Barshov
SBarshov PLLC
20 Lagoon Ln
Haverstraw, New York 10927
Tel: (917) 886-4328

*Attorneys for Plaintiff*

*\*Pro hac vice applications to be submitted*