**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Concern for Independent Living, Inc., <br><br> Plaintiff, <br><br> -v- <br><br> Town of Southampton, New York, Town Board of the Town of Southampton, <br><br> Defendants. | 2:24-cv-7101 (NJC) (JMW) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Concern for Independent Living, Inc. ("Concern") brings this action against the Town of Southampton, New York (the "Town"), and its Town Board (collectively "Defendants") for denying its application to rezone a parcel of land on which it planned to construct affordable housing for veterans and individuals with mental health disabilities. (Compl., ECF No. 1.)[1] The Complaint brings claims under the Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, the New York State Human Rights Law ("NYSHRL"), and Article 78 of the New York Civil Practice Law and Rules. (*Id.* ¶¶ 132–75.) Defendants moved to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

The motion to dismiss is denied in part and granted in part for the reasons explained below. Concern's damages claims for injuries suffered due to its exposure to an alleged

---

[1] All page references use ECF pagination except where noted.

discriminatory zoning process, including alleged dignitary and emotional harms, are ripe because the final decision requirement does not apply to these claims. Concern's claims for damages, declaratory, and injunctive relief stemming from the denial of its zone-change application are ripe because the Complaint alleges facts showing that Defendants arrived at a final decision in denying that application and that a variance would violate state law. The Court chooses to exercise jurisdiction over Concern's Article 78 claim under its independent grant of supplemental jurisdiction under 28 U.S.C. § 1367. Finally, the Court dismisses Concern's New York State Human Rights Law claims and claims against the Town Board.

## BACKGROUND

I assume as true all well-pled allegations in the Complaint and draw all inferences in favor of Concern in considering Defendants' Motion to Dismiss. *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 318 n.2 (2d Cir. 2021). The following facts are taken from the Complaint.

### I.    Concern proposes Liberty Gardens, an affordable-housing development for people with low income and people with disabilities.

Concern is a non-profit organization that helps individuals and families live in their communities with dignity and enhanced opportunities through the provision of housing and support services. (Compl. ¶ 26.) Concern constructs high quality, attractive housing for low-income individuals and people with disabilities and provides supportive services to help people with disabilities live with as much independence as possible. (*Id.*)

In March 2017, the Town's Director of Housing and Community Development approached Concern about building affordable housing on a five-acre lot owned by the Southampton Full Gospel Church in the unincorporated community of Tuckahoe ("Church Parcel") located in the Town. (*Id.* ¶¶ 1, 32–33.) In October 2018, at the Town's encouragement, Concern submitted a proposal to build and operate "Liberty Gardens," a 60-unit multi-family

2

housing development on the Church Parcel. (*Id.* ¶ 37.) Concern planned to rent each unit at a rate affordable to households earning "less than 60%" of Southampton's Area Median Income and to reserve half the units for individuals with a "primary diagnosis of serious mental illness." (*Id.* ¶¶ 37–38.) It also planned to set aside thirteen units for veterans and obtain subsidies for tenants with disabilities or especially low incomes. (*Id.* ¶¶ 37, 39.)

The Town's 2022 housing plan confirms the lack of affordable housing and housing support for people with disabilities in Southampton. (*Id.* ¶ 12.) Liberty Gardens would thus help address the need for affordable and supportive housing in Southampton and Suffolk County. (*Id.* ¶ 14.) Concern secured $30 million in funding from Suffolk County, New York State Housing and Community Renewal, Federal Home Loan Bank, and the New York State Office of Mental Health that could only be used to develop the Church Parcel. (*Id.* ¶ 10.) It preliminarily proposed monthly rental rates in Liberty Gardens ranging from $550 to $1,371 per month, well below the Town's median rent levels. (*Id.*)

## II.    Concern files a zone change application for permission to build Liberty Gardens.

Before breaking ground to build Liberty Gardens, Concern needed an exemption from the Town's zoning rules. (*See id.* ¶ 54.) The plot lay in the "R-20 zone," which permits developers to build at most two dwelling units per acre—far below the necessary allowance for Concern's proposed 60-unit, five-acre construction. (*Id.* ¶ 35.) To rezone the property, in October 2018, Concern filed a "pre-application with the Town Board" of the Town of Southampton ("Town Board"), an elected five-member body (including the Town Supervisor) empowered to amend Southampton's zoning code. *Id.* ¶¶ 28, 53; *see* Southampton, N.Y., Town Code § 330-5, https://ecode360.com/8700218. In the pre-application, Concern requested that the Board change the Church Parcel's zoning designation to "MF-44," which would permit construction of up to

3

eight units per acre. (Compl. ¶ 54.) The pre-application also sought a density increase under Southampton Town Code § 330-8, which would enable selected non-profits to build twelve units per acre on the parcel. *Id.*; Southampton, N.Y., Town Code § 330-8, https://ecode360.com/8700216. Concern's filings clarified that it intended to create housing for veterans and people with disabilities. (Compl. ¶ 55.)

After taking feedback from residents and the Town's Citizens Advisory Committee, Concern formally petitioned for the zone change in June 2020. (*Id.* ¶ 57.)

### III. Concern undergoes the New York State Environmental Quality Review Act review process.

Concern's zone-change application was subject to New York procedures for environmental review. Local agencies must conduct an assessment under the New York State Environmental Quality Review Act ("SEQRA") before adopting "rules, regulations, and procedures" or approving projects that "may affect the environment." N.Y. Comp. Codes R. & Regs. tit. 6, §§ 617.2(b), (e), 617.3(a), 617.4(b)(3). This procedural regime has substantive bite. For "Type I" actions—such as those granting "a zoning change" to construct significant numbers of new residential units—the developer must prepare an "environmental assessment form." *Id.* §§ 617.2(m), 617.4(b)(3), 617.6(a)(2).

The SEQRA form permits the lead agency managing the environmental review process (here, the Town Board) to determine whether the zone change would potentially have "significant adverse environmental impact[s]." Compl. ¶¶ 58, 60; *see* N.Y. Comp. Codes R. & Regs. tit. 6, §§ 617.2(n), 617.4(a)(1). If the Town Board finds such potential effects, it may require Concern to submit a draft Environmental Impact Statement ("EIS") containing "a statement and evaluation of the potential significant adverse environmental impacts" as well as possible mitigation measures. N.Y. Comp. Codes R. & Regs. tit. 6, §§ 617.9(a)–(b); Compl.

4

¶ 60. If the Town Board accepts the draft EIS as adequate for public review, it may then invite public comments and hearings regarding the proposed action and the draft EIS. N.Y. Comp. Codes R. & Regs. tit. 6, § 617.9(a)(4). After receiving public comments, the Town Board may prepare or approve a final EIS. *Id.* § 617.9(a)(5). Only then, and after it has afforded agencies and the public "a reasonable time period" to consider the final EIS, may the Town Board "make a final decision to undertake, fund, approve or disapprove" the proposed zone change. *Id.* § 617.11(a), (c). In doing so, the Town Board must issue a "findings statement" explaining how its decision "avoids or minimizes adverse environmental impacts to the maximum extent practicable." *Id.* § 617.11(c)–(d).

Concern followed this procedure. In May 2020, it submitted an environmental assessment form regarding the proposed zone change. (Compl. ¶ 58.) In March 2021, Concern submitted an expanded environmental assessment form, which elaborated on its original proposal. (*Id.*) In July 2021, the Town Board concluded that the proposed zone change would potentially generate an adverse environmental impact and required Concern to prepare a draft EIS. (*Id.* ¶ 60.) So, Concern participated in another "public process" to determine the scope of the EIS so that "members of the public" and "other interested agencies" could comment on the change-of-zone application. (*Id.* ¶ 61.) It then conducted due diligence and submitted a 151-page draft EIS in June 2022, which the Town Board accepted for filing, determining that it had complied with the scope required by the Town Board and SEQRA and was adequate for public review. (*Id.* ¶¶ 15, 62.)

The Town held two public hearings over Concern's draft EIS for the Liberty Gardens' zone change proposal in September and October 2022. (*Id.* ¶ 63.) Town residents objected to various facets of Liberty Gardens' potential impact on the local community, submitting around

441 public comments in all. (*Id.* ¶¶ 63–64, 72.) Across two hearings, "68 speakers provided 260 separate verbal comments or questions." (*Id.* ¶ 63.) Members of the public submitted "38 additional written correspondences" during this time. (*Id.*) Objections ranged from "concerns about traffic," "SEQRA compliance, density, the impact on natural resources and human health, the impact on community services," and "the population to be served by the development." (*Id.* ¶ 64.) The latter concern was voiced by opponents who protested that Liberty Gardens would attract "people who may not be able to work," or outsiders "who don't live here." (*Id.* ¶ 65.) One opponent objected that the proposed Liberty Gardens development was equivalent to "a secure facility for a compromised population that will be imported here." (*Id.*)

Town Councilwoman Cyndi McNamara emerged as a vocal opponent of Liberty Gardens. (*Id.* ¶ 66.) She suggested that the development would attract low-income residents into the Town. (*Id.* ¶ 67.) She also suggested that the psychiatric needs of prospective Liberty Gardens tenants would strain Town services and questioned their burden on the community, specifically opining that veterans who would live in the complex would require comprehensive psychiatric emergency treatment. (*Id.* ¶ 68.) According to the Complaint, Ms. McNamara's concerns—highlighted in her unsuccessful campaign for Town Supervisor—heightened "public pressure" against the project. (*Id.* ¶¶ 70–71.) The Southampton Press ran an editorial asserting that Liberty Gardens would provide "affordable housing" as opposed to "workforce housing" and that 30 units would be set aside for "Vietnam-era veterans with mental health diagnoses, who would require extensive support services." (*Id.* ¶ 69.) Although the editorial was incorrect, it contributed to growing public pressure opposing the project based on the disabilities of prospective residents. (*Id.* ¶ 70.)

In November 2023, Concern submitted a final EIS responding to all "441 comments or questions raised during the environmental review process." (*Id.* ¶ 72.) The final report addressed public concerns about Liberty Gardens' potential impact on potable water, displacement of natural areas, noise, pollution, effect on Town aesthetics, burden on community services, and SEQRA compliance, as well as the selection criteria for prospective residents. (*Id.* ¶¶ 73–77.) Ultimately, however, the final EIS concluded that Liberty Gardens would pose "no significant adverse environmental impacts" that would require Concern to explore alternative development plans. (*Id.* ¶ 99.) In response to water quality concerns, Concern negotiated an agreement with a local rehabilitation center "to pump wastewater offsite to the [c]enter's Sewage Treatment Plant." (*Id.* ¶ 101.) Concern also found that the development would not affect endangered species or unique habitats, cohered with the neighborhood's visual character, and would create limited noise and pollution. (*Id.* ¶ 74.) In the final EIS, Concern responded to public comments about housing density by removing a 10-unit two-story building from the planned development, thereby reducing the number of units from 60 to 50. (*Id.* ¶ 80.) In response to questions about prospective residents, the final EIS projected that most occupants "would be people already living or working" in Southampton and emphasized Concern's intent to advertise Liberty Gardens to local groups. (*Id.* ¶ 75.) The report affirmed that Concern did not violate SEQRA requirements in proposing the zone change. (*Id.* ¶ 76.) Finally, Concern conceded that the development would increase total demand for local "water, energy, healthcare, waste management, and garbage pickup services"—but argued that a development under the existing zoning designation would have done so as well. (*Id.* ¶¶ 77–78.) The final EIS further theorized that Liberty Gardens imposed only a limited net burden on community services because it would generate $1.5 million in revenue for the Town over 30 years. (*Id.* ¶ 77.)

Even after Concern's issuance of the final EIS, Councilwoman McNamara continued to oppose the project on the basis that units would be reserved for people "who are unable to remain stably housed due to a mental health diagnosis." (*Id.* ¶ 84.) Ultimately, however, three of the five Town Board members disagreed with McNamara and concluded that the final EIS "sufficiently addressed all potential environmental impacts associated with the project." (*Id.* ¶ 85.) Accordingly, the Town Board voted to accept the final EIS and filed a Notice of Completion on December 27, 2023, by a vote of 3 to 2. *Id.* ¶¶ 81, 86; *see* N.Y. Comp. Codes R. & Regs. tit. 6, § 617.9(a)(6).

The political winds changed in November 2023, when Southampton residents voted to replace two of the Town Board members who had voted to approve the final EIS. (Compl. ¶ 88.) After those Board members were replaced, Town Supervisor Maria Moore asked Concern if it would develop "alternate sites" to the Church Parcel. (*Id.* ¶ 90.) Reasoning that "pre-development costs incurred at the Church Parcel and environmental concerns at other sites" foreclosed it from considering alternate locations, Concern declined. (*Id.*)

**IV.     The Town Board adopts a Findings Statement rejecting Concern's proposal.**

The Town Board finally issued a Findings Statement on June 11, 2024—more than seven years after "Town staff" had approached Concern about this project in 2017. (*See id.* ¶¶ 13, 92.) Concern alleges that, upon information and belief, the Board had originally prepared a draft statement agreeing with the conclusion in the final EIS that "the project would *not* have generated any unmitigated significant adverse environmental impacts." (*Id.* ¶ 91 (emphasis added).) But when the Board issued its Findings Statement in June 2024, it ultimately found by a 4–1 margin that rezoning the Church Parcel *would* impose significant adverse environmental impacts. (*Id.* ¶¶ 92–94.) In contrast to the final EIS, the Town Board's Findings Statement stated

8

that the proposed development would (1) deplete potable water supplies, (2) adversely affect the local ecosystem, (3) strain community services, (4) increase traffic, (5) compromise the town's residential character, and (6) impose "other impacts" resulting from construction and energy usage. (*Id.* ¶ 97.) The Findings Statement offered two purported "alternatives" to mitigate those impacts: not to build Liberty Gardens at all, or to build it within the existing two-dwelling-per-acre zoning limitation. (*Id.* ¶ 98.)

## PROCEDURAL HISTORY

Finding the Town's proposed "alternatives" inadequate, Concern filed the Complaint against the Town and the Town Board on October 9, 2024. (*Id.* ¶ 122.) The Complaint contends that the reasoning set forth in the Board's Findings Statement is pretext to discriminate against prospective residents based on their disabilities and military status. It brings five claims. Count One alleges that Defendants discriminated on the basis of disability in violation of the Fair Housing Act ("FHA") by blocking the Liberty Gardens development. (*Id.* ¶¶ 132–40.) Counts Two and Three allege that in doing the same, Defendants violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. (*Id.* ¶¶ 141–46.) Count Four claims that Defendants discriminated against people with disabilities and veterans in violation of the NYSHRL. (*Id.* ¶¶ 147–54.) Count Five challenges the legality of the Findings Statement under Article 78 of the New York Civil Practice Law and Rules. (*Id.* ¶¶ 155–75.) The Complaint requests a declaratory judgment, damages, and an injunction ordering Defendants to approve Concern's change-of-zone application and to issue a Findings Statement consistent with the final EIS. (*Id.* at 41.)

Defendants requested a pre-motion conference in anticipation of a proposed motion to dismiss on December 10, 2024. (Letter Mot., ECF No. 17.) Judge Rachel P. Kovner, to whom

9

this case was previously assigned, waived the pre-motion conference requirement and ordered the parties to brief and file a motion to dismiss by March 1, 2025. (Elec. Order, Dec. 23, 2024.) That motion has been filed. (Mot. to Dismiss, ECF No. 27.) In their motion to dismiss, Defendants attach copies of the following documents, which they allege are incorporated by reference into the Complaint: the draft EIS, the final EIS, the Findings Statement, selected minutes of Town Board meetings, and the Town Board Resolution denying Concern's change-of-zone application. (ECF Nos. 27-3 to 27-13.) Concern does not contest the use of these documents and concedes that they are referenced in the Complaint. *See* Mem. of L. in Opp'n to Defs.' Mot. to Dismiss ("Opp'n Mot. to Dismiss"), ECF No. 27-14; Hr'g Tr. at 64:4–65:4. On October 21, 2025, the case was reassigned to this Court, which scheduled oral argument. (Elec. Order, Oct. 21, 2025.) The Court held argument on February 25, 2026, and thanks the parties for their helpful arguments in this case.

Separately, the parties sought a stay of discovery pending the resolution of the motion to dismiss, which Judge James M. Wicks granted on January 29, 2025. (Mot. to Stay Discovery, ECF No. 20.) Concern moved to lift the stay on November 7, 2025, arguing that proceeding with the action would help allay its ongoing monthly costs to "maintain its option to purchase the land at issue." (Mot. to Lift Stay at 1, ECF No. 29.) Judge Wicks denied the motion without prejudice for this Court to determine at oral argument whether the discovery stay should continue. (Order, ECF No. 31.) Because the Court now resolves Defendants' motion to dismiss, the stay of discovery is lifted.

## LEGAL STANDARD

Because ripeness is a "constitutional prerequisite to exercise of jurisdiction," the Court analyzes a motion to dismiss for lack of ripeness under Federal Rule of Civil Procedure 12(b)(1). *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation omitted). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

When a party raises a facial challenge to the court's subject matter jurisdiction, "the plaintiff has no evidentiary burden"; the district court need only "determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (brackets and internal quotation marks omitted); *see also Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024). In assessing such a facial challenge to justiciability, a court "must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). The court may also take judicial notice of matters of public record and may consider documents incorporated by reference in, attached to, or integral to the complaint. *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Cruz v. N.Y. City Transit*, No. 24-cv-89, 2025 WL 209598, at *4 (S.D.N.Y. Jan. 16, 2025) (doing so in Rule 12(b)(1) motion); *Cruz v. N.Y.C. Dep't of Educ.*, No. 19-cv-856, 2020 WL 1322511, at *6 (S.D.N.Y. Mar. 20, 2020) (same).

Under Rule 12(b)(6), by contrast, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Green v. Dep't of Educ. of N.Y.C.*, 16 F.4th 1070, 1076–77 (2d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In determining

11

if a claim is sufficiently plausible to withstand dismissal," a court also "accepts all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs . . . ." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021) (internal quotation marks and citation omitted). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating Defendants' Rule 12(b)(6) motion, the Court may consider all allegations set forth in the Complaint, along with "matters of which judicial notice may be taken" and materials that are attached to the Complaint, incorporated by reference in it, or are integral to it. *See Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023). A document is "integral to a complaint" where the "complaint relies heavily on its terms and effect," even if the "document is not expressly incorporated by reference." *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415 (2d Cir. 2024).[2]

---

[2] Here, the parties agree that the exhibits attached to Defendants' Motion to Dismiss do not "contradict the relevant allegations in the pleadings." *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 290 n.1 (2d Cir. 2022). At oral argument, the parties confirmed that those exhibits are all documents that are incorporated by reference in the Complaint or are integral to it, and that the parties did not dispute any of the relevant factual allegations. (Hr'g Tr. at 64:4–65:4.) This Court may therefore consider those documents in resolving the pending motions, although the parties are correct that these documents do not contradict the allegations of the Complaint.

## DISCUSSION

For the following reasons, the motion to dismiss is granted in part and denied in part. The motion to dismiss for lack of ripeness is denied.[3] Defendants' request that the Court decline to exercise supplemental jurisdiction over Concern's Article 78 claim is also denied. On the merits, the Rule 12(b)(6) motion to dismiss the NYSHRL claims is granted because Concern "does not object to" the dismissal of these claims. (Opp'n Mot. to Dismiss at 16–17.) Finally, the motion to dismiss the Town Board as a duplicative defendant is granted.

## I.    Concern's claims are ripe.

The ripeness doctrine "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020). The doctrine reflects both "Article III limitations on judicial power" and "prudential reasons for refusing to exercise jurisdiction." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (citation omitted); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

The Supreme Court and the Second Circuit have set out rules governing ripeness in the context of land-use disputes. For the archetypal takings claim, a plaintiff must wait until the "government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on*

---

[3] While Defendants do not specify whether they move to dismiss for lack of ripeness under Rule 12(b)(1) or 12(b)(6), they fail to establish grounds for dismissal under either standard. (*See* Mot. to Dismiss at 10–15.)

*other grounds*, *Knick v. Township of Scott*, 588 U.S. 180 (2019). If "avenues still remain for the government to clarify or change its decision," a plaintiff's claim is generally not ripe. *Pakdel v. City & County of San Francisco*, 594 U.S. 474, 480 (2021) (per curiam). However, a plaintiff challenging a land use decision may establish ripeness by showing that "pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005).

This two-step test reflects the "high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer," *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 738 (1997), and a hesitance to inhibit the "give-and-take negotiation that often resolves land use problems," *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 297 (2d Cir. 2022). It also ensures that a plaintiff seeking "an injunction blocking the disapproval" of its project has identified a defined injury in that it cannot pursue its land use goal. *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 122 (2d Cir. 2014). For that reason, the Second Circuit has extended the two-step rule to claims "based on substantive due process; First Amendment rights of assembly and free exercise; the Religious Land Use and Institutionalized Persons Act of 2000," and state religious-liberty laws. *Id.* However, the final decision requirement does not apply where a plaintiff seeks damages for injuries that are "independent of the challenged land-use decision," such as injuries suffered as a result of the unequal treatment itself. *See Sunrise Detox*, 769 F.3d at 123.

Concern's damages claims challenging injuries suffered as a result of its exposure to an alleged discriminatory zoning process itself, such as dignitary and emotional harms, are ripe and the final decision requirement does not apply to these claims. Moreover, its claims for damages and an injunction remedying the denial of the change-of-zone application are also ripe. The

Court finds that Defendants arrived at a final decision as to Concern's request for a change-of-zone application, and in the alternative, that seeking a variance would be futile.[4] I address each argument in turn.

A. Concern's discrimination claims for damages stemming from emotional and reputational harms are ripe and fall outside the final decision requirement.

Generally, a "plaintiff alleging discrimination in the context of a land-use dispute" falls within the ambit of the final-decision rule. *Id.* But the final-decision rule is not "mechanically applied." *See Vill. Green*, 43 F.4th at 294 (citation omitted). The Second Circuit has not addressed "whether a property owner who claimed that a local official vetoed his or her development project out of hostility" to a protected class "could seek immediate recompense in federal court from that official . . . *even in the absence of a final decision . . . .*" *Sunrise Detox*, 769 F.3d at 123 (emphasis added). But it has suggested that the answer is "Yes." When a plaintiff "suffer[s] some injury independent of the challenged land-use decision," they need not establish that the official imposed that injury in a final decision. *Id.* That is because "when a public official violates constitutional or statutory rights of citizens to equal treatment, we allow resort to the federal courts to vindicate those rights, without requiring the offended person to exhaust potentially available state remedies first." *Id.* At that moment, the injury has already occurred. Further administrative appeals or applications for a variance "would do nothing to further define" the injury of facing discrimination itself. *Id.* (citation omitted).

Any claims based on injuries Concern allegedly suffered from exposure to a discriminatory process itself—independent of the denial of its change-of-zone application—are

---

[4] Because the Court finds Concern's claims ripe in this instance, it does not address whether challenges to rezoning applications are always ripe when denied by a town's legislative body. (*See* Opp'n Mot. to Dismiss at 19.)

ripe *even absent a final decision* under the principles recognized in *Sunrise Detox*. There, a company requested a permit to operate an addiction treatment facility. *Id.* at 119. The Department of Building declined. *Id.* at 120–21. The Second Circuit concluded that the company's request for "an injunction blocking the disapproval and authorizing construction of its project" essentially made its claim an archetypal land-use claim, which required a final decision by the city before the developer could sue. *Id.* at 123. But it recognized that certain discrimination claims might rest on independent harms that could bypass such a requirement. *See id.* The Second Circuit again recognized this principle in *Village Green*. 43 F.4th at 295–96 & n.5.

The Complaint in this case pleads at least some claims that fall under the latter category. Concern requests an injunction ordering Defendants to retract their Findings Statement and alter the zoning map, claims for relief that fall within the scope of the finality requirement. (*See* Compl. at 41.) But it also seeks damages on the grounds that Defendants used "methods of administration that discriminate against people with mental health diagnoses." *Id.* ¶ 142; *see also Vill. Green*, 43 F.4th at 295–96 & n.5 (recognizing that injuries arising from exposure to a discriminatory process may be ripe). Supplementing those allegations, the Complaint claims that "Defendants' discriminatory conduct has caused harm to Plaintiff's business reputation . . . ." (Compl. ¶ 129.) As an example, the Complaint alleges that Defendants' discriminatory conduct painted them as developers who "take[] parcel[s] off the market through an option to purchase contract" but fail to follow through on the option. (*Id.*) In doing so, Defendants frustrate Concern's mission to help people live "in their communities with dignity." (*Id.* ¶ 130.) The Court therefore understands the Complaint to seek damages arising from the discrimination itself in requesting "full[] compensat[ion] . . . for the loss that has been caused by the conduct of

16

Defendants alleged." (*Id.* at 41.) That claim for damages from the denial of "equal treatment" for harm to business reputation and frustration of mission is ripe. *Sunrise Detox*, 769 F.3d at 123.

Resisting this conclusion at oral argument, Defendants insist that this passage of *Sunrise Detox* is dicta. (Hr'g Tr. at 57:17–21.) But they offer no competing theory as to why a property owner injured by the exposure to discriminatory treatment itself and seeking relief for injuries independent of the land-use decision must show that the land-use decision is final. And legions of federal courts in New York have taken the Second Circuit's guidance set forth in *Sunrise Detox*, which was subsequently reiterated in *Village Green*. *See, e.g.*, *Rehab. Support Servs., Inc. v. Town of Colonie*, No. 15-cv-589, 2018 WL 1415199, at *3 (N.D.N.Y. Mar. 20, 2018) (recognizing that plaintiffs showing "some injury independent of the challenged land-use decision" can be exempt from final-decision requirement); *Orthodox Jewish Coal. v. Village of Chestnut Ridge*, No. 19-cv-443, 2021 WL 1226930, at *12 (S.D.N.Y. Mar. 31, 2021) (finding claim that zoning law "w[as] discriminatory on [its] face" ripe even absent final decision because discrimination posed independent injury "sufficient to confer standing" (citation omitted)); *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 398 (E.D.N.Y. 2021) (stating that "injury independent of the challenged land-use decision" was not subject to final-decision rule). Defendants fail to provide a substantive reason to ignore the Second Circuit's directive in *Sunrise Detox* and *Village Green.* Accordingly, Concern's damages claims challenging discrimination resulting in alleged harms to its business reputation and frustration of mission are ripe.

      B.  <u>The Town of Southampton made a final decision regarding Concern's request for permission to construct Liberty Gardens.</u>

Concern's remaining theory that Defendants deprived it of the opportunity to construct affordable housing faces the final-decision test because it seeks "an injunction blocking the

disapproval and authorizing construction of its project" and damages for Defendants' denial of its change-of-zone application. *Sunrise Detox*, 769 F.3d at 123; *see also* Compl. at 41 (seeking an injunction that, among other things, would "direct[] Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct . . . including, but not limited to, issuance of a SEQRA Findings Statement that is consistent with the DEIS and FEIS, and approval of the Liberty Gardens change of zone application").

The final-decision test also contains two prongs that defy mechanical application. First, the plaintiff must submit a "meaningful application to" the relevant "municipal agencies to address its land-use dilemma." *Vill. Green*, 43 F.4th at 297 (quoting *Murphy*, 402 F.3d at 348). In many cases, that requires "at least one meaningful application for a variance" or authority "to use [the] property in a manner forbidden by the zoning regulations," *Murphy*, 402 F.3d at 345 n.1, 348 (citation omitted); *see also 7-Eleven v. Inc. Vill. of Mineola*, 7 N.Y.S.3d 517, 518–19 (App. Div. 2015). But in others, a meaningful application may consist of something more robust—like a formal petition to a town board to "remov[e] . . . two [covenants and restrictions]" from a rezoned plot of land. *Vill. Green*, 43 F.4th at 290, 297. The touchstone of this first prong is to ensure that an abstract dispute is deferred until it arises "in a more concrete and final form." *Murphy*, 402 F.3d at 347. Second, the municipality must "have an opportunity to commit to a position." *Vill. Green*, 43 F.4th at 297. Together, these two steps ensure that by the time of suit, the government has exhausted its opportunities to "clarify or change its decision." *Pakdel*, 594 U.S. at 480.

Defendants suggest that because Concern has not sought use and area variances from the Southampton Zoning Board of Appeals or a density increase from the Southampton Planning Board, the Town Board did not make a final decision denying approval to build Liberty Gardens.

18

(Mem. of L. in Supp. of Defs.' Mot. to Dismiss ("Mot. to Dismiss") at 14–15, ECF No. 27-13.) Concern rejoins that the Town Board reached a final decision when it issued the Findings Statement and denied its change-of-zone application. (Opp'n Mot. to Dismiss at 16–17.)

The Complaint plausibly alleges that Defendants made a final decision in denying Concern's application for a zone change. First, Concern made one meaningful application to use its property in a manner forbidden by existing zoning regulations. All agree that Concern cannot construct a 50-unit multi-family development on the five-acre Church Parcel, which is currently zoned for at most 10 single-family units. (*See* Compl. ¶ 54.) So, Concern requested that the Town Board exempt it from this rule by filing a "pre-application . . . seeking a zone change" in 2018. (*Id.* ¶ 53.) In June 2022, Concern wrote a draft EIS, which it amended in 2023 in response to public feedback—specifically, 441 comments or questions raised during the environmental review process. (*Id.* ¶¶ 62, 72.) There is "no question" that Concern submitted a "'meaningful application' to municipal agencies to address its land-use dilemma." *Vill. Green*, 43 F.4th at 297–98 (citation omitted). In proceeding through a seven-year regulatory gauntlet, it "did not shirk the 'give-and-take negotiation that often resolves land use problems.'" *Id.* (finding final decision where a developer "began the arduous process of modifying" covenants on rezoned property over a three-year long process) (citation omitted). Indeed, in response to public comments, Concern revised its proposal for Liberty Gardens by removing a 10-unit building and reducing the number of proposed units from 60 to 50. (Compl. ¶¶ 37, 80, 161.)

Second, the Complaint plausibly alleges that the Defendants exercised their "opportunity to commit to a position" with respect to Liberty Gardens. *Vill. Green*, 43 F.4th at 297. Again, *Village Green at Sayville, LLC v. Town of Islip* is analogous. There, a developer received permission to rezone a plot of land on condition that it follow a set of covenants. *Id.* at 290. The

19

developer later "petitioned the Town Board" to adjust the covenants so that it could construct a 64-unit apartment complex. *Id.* at 290–91. Instead of voting on the petition, the Board deemed it to have "fail[ed] for lack of second" and shelved any future vote. *Id.* at 292, 298. The Second Circuit found that the Town Board made a final decision even absent an official denial, because its behavior showed that it had arrived "at a definitive position on the issue that inflict[ed] an actual, concrete injury" on the developer. *Id.* at 298 (quoting *Williamson Cnty.*, 473 U.S. at 193). Asserting jurisdiction would not "entangl[e]" the courts "in abstract disagreements over matters that are premature for review." *Id.* at 293 (citation omitted).

This case parallels *Village Green*. The Town Board also "ha[d] an opportunity to commit to a position" when Concern submitted a final EIS for its approval. *Id.* at 297. The Town Board first adopted the final EIS on December 27, 2023, concluding that it "sufficiently addressed all potential environmental impacts associated with the projects" (Compl. ¶¶ 85–86), but then flipped its position by issuing a June 11, 2024 Findings Statement concluding that the only way to avoid adverse environmental impacts from the proposed rezoning was to deny Concern's change-of-zone application—and in effect doom the Liberty Gardens development (*id.* ¶ 98). The Town Board then did what it said and formally denied Concern's "zone change application." (*Id.* ¶ 16.) In finding that Liberty Gardens would impose irremediable adverse environmental effects, Defendants took a definitive position that Concern could not build Liberty Gardens on the Church Parcel within the R-20 zone. *See Vill. Green*, 43 F.4th at 297–98. That conclusion perfected the Town Board's decision and ripened Concern's lawsuit.

Defendants resist this conclusion, primarily relying on *BMG Monroe I, LLC v. Village of Monroe*, 93 F.4th 595 (2d Cir. 2024). Their arguments are unpersuasive. The Second Circuit there emphasized that ripeness depends "on a property owner submitting at least one meaningful

20

application for a *variance*." *Id.* at 601 (emphasis added) (citation omitted). Defendants take that line to require, in all instances, "*variance relief* from the" Zoning Board of Appeals ("ZBA"). (Mot. to Dismiss at 8 (emphasis added).) The words, however, cannot bear that brightline rule. The first clue is the opinion's text, in context. The Court declines to read *BMG Monroe* to silently reverse *Village Green*'s holding that a "petition[]" to "the Town Board to allow it to construct an apartment complex of 64 rental units" by removing two covenants attached to a rezoned plot was a "meaningful application" notwithstanding the fact that it was not specifically an application for a *variance*. 43 F.4th at 290–91, 296.

The second clue is the federal courts' mantra that "judicial opinions are not statutes, and we don't dissect them word-by-word as if they were." *See United States v. Chastain*, 145 F.4th 282, 294 n.4 (2d Cir. 2025) (quoting *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting)). Yet Defendants' approach would do just that. Defendants overread the reference to "variance" in *BMG Monroe* and would require every developer to apply for relief from the ZBA and Planning Board before suit, even when other paths for obtaining that kind of dispensation would be more appropriate. The facts of *BMG Monroe* illuminate why. There, a developer challenged the "discriminatory enforcement of zoning regulations" but failed "to seek a second variance *after it sought to depart from the terms of*" an initial variance. 93 F.4th at 601 (emphasis added). The Second Circuit held that when the village planning board informed the developer that it had exceeded the conditions of the first variance, it "naturally follow[ed]" that the developer should have applied for another variance. *Id.* at 603. That made sense, because the developer obtained its first allowances through an initial variance. *See id.* at 599–600.

Through that lens, the Court's holding in this action is consistent with *BMG Monroe*. Nothing in that opinion precluded a developer from selecting a more shelf-stable method to

obtain relief—here, a change-of-zone application. After all, the Second Circuit defined a variance as the authority to use property "in a manner forbidden by the zoning regulations." *Murphy*, 402 F.3d at 345 n.1 (citation omitted); *BMG Monroe*, 93 F.4th at 602. And a zone change is authority to use property in a manner previously forbidden by the zoning regulations. Because Defendants originally "approached Concern" to build Liberty Gardens in the first place (Compl. ¶ 13), it "naturally follows" here that Concern applied for regulatory relief from the Town Board rather than from the ZBA and the Planning Board, *BMG Monroe*, 93 F.4th at 603. That is true even if the Town Board is a different entity from the ZBA and Planning Board, because the inquiry focuses on whether the *plaintiff* obtained a meaningful dispensation from the rules—even in context. To hold otherwise and require a plaintiff to exhaust all possible forms of relief would inflate ripeness into an exhaustion requirement.[5] *See Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 26 n.11 (2d Cir. 1984). Because "the initial decisionmaker has arrived at a definitive position on the issue" of Concern's zone-change application, the claims challenging the denial of this application are ripe. *Williamson Cnty.*, 473 U.S. at 193.

---

[5] Indeed, the use and area variances required to achieve the same effect as Concern's change-of-zone application may impose an even greater burden than the parties represent. While the parties do not brief this point, it appears that a variance from the Southampton Building Inspector or ZBA would likely *also* trigger the environmental review processes under SEQRA because Concern's proposed variance would obtain the same result as the zone change. *See, e.g.*, *Gidney v. Zoning Bd. of Appeals*, 171 N.Y.S.3d 274, 275 (App. Div. 2022) (affirming SEQRA review of variance application); *Buckley v. Zoning Bd. of Appeals*, 139 N.Y.S.3d 732, 734 (App. Div. 2020) (same). Therefore, it also "may have a significant adverse impact on the environment and require[] the preparation of an EIS." N.Y. Comp. Codes R. & Regs. tit. 6, § 617.4(a)(1).

C. Even if Defendants did not render a final decision as to Concern's application to develop Liberty Gardens, seeking variances would be futile.

A plaintiff is "excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. This exception protects "property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 602 (S.D.N.Y. 2013), *aff'd*, 945 F.3d 83 (2d Cir. 2019) (citation omitted). For instance, a developer need not seek a dispensation from an agency that "lacks discretion to grant variances" or that "has dug in its heels and made clear that all such applications will be denied." *Murphy*, 402 F.3d at 349; *Williamson Cnty.*, 473 U.S. at 193. But "mere doubt" that a variance "would be denied is insufficient to establish futility." *Dreher v. Doherty*, 531 F. App'x 82, 83 (2d Cir. 2013) (summary order); *BMG Monroe I*, 93 F.4th at 603. Stating that a government entity is "openly hostile to" a proposal, for instance, is not enough. *See Xikis v. City of New York*, No. 89-cv-2000, 1990 WL 156155, at *6 (E.D.N.Y. Sept. 28, 1990); *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 408 (E.D.N.Y. 2008).

Concern argues that even if it had to request a variance from the Zoning Board of Appeals, doing so would be futile. It claims that the density bonus incentive for "community benefit units," which Defendants urge Concern to request, is not generous enough to permit a 50-unit project. (Mot. to Dismiss at 14; Opp'n Mot. to Dismiss at 21–22.) As to the variance itself, Concern suggests that the Southampton ZBA lacks discretion to grant the "use variance to permit multi-family dwellings" and "area variance to increase the permitted density to ten units per acre" that would allow Liberty Gardens to be a viable housing complex. Such a dramatic exemption, it argues, would redraw the zoning map—circumventing the separation between the

23

Town Board's power to create the zoning rules and the ZBA's power to grant variances from those rules "in harmony with their general purpose and intent." N.Y. Town Law § 261.

A density increase would be futile. Under Southampton Town Code § 330-9(C)(2), the Town Planning Board "may authorize a maximum density increase of up to 50% of the as-of-right yield for community benefit units." Southampton, N.Y., Town Code § 330-9(C)(2), https://ecode360.com/8700476#8700536. But the as-of-right yield under the existing R-20 zone at issue permits Concern to build only two units per acre. (Compl. ¶ 35.) A 50% increase from that two-unit figure under Section 330-9(2) would not come close to the 10-unit-per-acre allowance the project requires. (*See id.* ¶ 37.) Because the Town Planning Board lacks discretion to grant the substantial incentive increase "of the type [Concern] would likely require," Concern has plausibly alleged facts showing that pursuing a substantial incentive increase is futile. *Londregan v. Town of East Lyme*, 666 F. Supp. 3d 192, 201 (D. Conn. 2023).

Concern also plausibly alleges that the use and area variances would also be futile. In Southampton, the ZBA processes requests for variances from the Town's zoning laws. Southampton, N.Y., Town Code § 330-166, https://ecode360.com/8702293. But the ZBA may not "remake the zoning map under the guise of granting a variance." *Levitt v. Inc. Vill. of Sands Point*, 189 N.Y.S.2d 212, 214–15 (1959); *see also Lerner v. Town of Islip*, 272 F. Supp. 664, 668 (E.D.N.Y. 1967) (finding claim ripe on this ground); *Hess v. Zoning Bd. of Appeals of Vill. of Sands Point*, 188 N.Y.S.2d 1028, 1029 (N.Y. Sup. Ct. 1955) ("The Board of Appeals is an administrative body and may not usurp the functions of the village trustees."). That is because rezoning is a legislative power, vested in the Town Board. By contrast, the ZBA wields the administrative "power" to issue "variation[s] or dispensation[s]" from the rules, "where strict enforcement of the letter of the restriction would cause practical difficulties or unnecessary

24

hardship." *Levy v. Bd. of Standards & Appeals*, 267 N.Y. 347, 352–53 (1935). The converse is also true: the ZBA may not "review the legislative general rules regulating the use of the land." *Id.* at 352. Because any variance must cohere "with the general intent of the zoning restrictions," *id.* at 353, ZBAs across New York have declined to grant variances which would practically effect "a change of zone," *Hess*, 188 N.Y.S.2d at 1029; *In re Northampton Colony, Inc.*, 219 N.Y.S.2d 292, 293–94 (N.Y. Sup. Ct. 1961); *see also Ifrah v. Utschig*, 98 N.Y.2d 304, 309 (2002) (upholding variance denial on statutory grounds that the variance was substantial); *Pecoraro v. Bd. of Appeals*, 2 N.Y.3d 608, 614 (2004) (same); *Allstate Props., LLC v. Bd. of Zoning Appeals*, 856 N.Y.S.2d 130, 132 (App. Div. 2008) (same). To allow such a variance would "violate[] the general purpose of the" zoning map and intrude upon the Town Board's jurisdiction. *Van Deusen v. Jackson*, 312 N.Y.S.2d 853, 857 (App. Div. 1970); *Scarsdale Supply Co. v. Village of Scarsdale*, 8 N.Y.2d 325, 330 (1960).

New York's statutory scheme confirms this approach. To safeguard the Town Board's prerogative, New York law emphasizes that a ZBA may grant only the "minimum variance that it shall deem necessary and adequate" to address an applicant's hardships, but "at the same time preserve and protect the character of the neighborhood." N.Y. Town Law § 267-B(2)(c). And in imposing variance conditions, the ZBA must ensure that such conditions follow "the spirit and intent of the zoning ordinance or local law." *Id.* § 267-B(4).

The Complaint adequately alleges that Defendants' proposed variance would violate New York law by implementing precisely the zone change rejected by the Town Board. To build Liberty Gardens by way of variance, Concern would need a 400% increase in the density limit permitted by the R-20 zone. (*See* Compl. ¶ 54.) Because the Church Parcel permits only single-family developments, Concern would *also* require a *separate* use variance for multi-family

25

housing on the limited land. (Opp'n Mot. to Dismiss at 22.) A reasonable decisionmaker could find that this kind of dramatic transformation in the Church Pacel's carrying capacity contravenes the "spirit and intent of the zoning ordinance." N.Y. Town Law § 267-B(4). Accordingly, the Complaint sets forth allegations rendering plausible that the ZBA lacks discretion to issue the variance, so requesting one is futile at this stage.

Resisting this conclusion, Defendants suggest that the "negotiation process inherent in land use matters" might result in a development that is both acceptable to Concern and within the ZBA's prerogative. (Reply Mem. of L. in Supp. of Mot. to Dismiss at 13, ECF No. 27-17.) But Defendants cite no authority showing that Concern's claim against the denial of its zone-change application is unripe simply because Concern could theoretically settle for a project with different characteristics. And they do not adduce evidence as to what compromise development Concern might accept. The Complaint indicates that Concern already negotiated with the District to reduce the number of planned units from 60 to 50. (Compl. ¶ 80.) Though "mere doubt" as to a variance's success cannot establish futility, *Dreher*, 531 F. App'x at 83, Defendants cannot rebut Concern's case by simply asserting that the ZBA would perform a miracle or that Concern would accept a far smaller development.

## II.    The Court exercises supplemental jurisdiction over Concern's Article 78 claim.

Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A group of claims form part of the same case or controversy if they are derived from "a common nucleus of operative fact." *Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 245 (2d Cir. 2011) (citation omitted). At issue is whether the Court may exercise supplemental jurisdiction over Concern's Article 78 claim.

26

Under Article 78, a party may challenge a municipal entity's actions that are legally wrongful, outside the officer's jurisdiction, arbitrary and capricious, or unsupported by substantial evidence. N.Y. C.P.L.R. § 7803(2)–(4). Though Article 78 proceedings offer expedited procedures for litigants, such claims "shall be brought in the supreme court in the" relevant county. *Id.* § 7804(b). Defendants ask that the Court "decline to exercise its discretionary supplemental jurisdiction" over Concern's claim under Article 78 of the New York Civil Practice Law and Rules. (Mot. to Dismiss at 16.)

For the reasons explained below, the Court finds that it may exercise supplemental jurisdiction over Concern's Article 78 claim under Section 1367(a). The Court chooses to exercise that jurisdiction in view of the factors set out in 28 U.S.C. § 1367(c).

A.  <u>As an initial matter, federal courts may exercise supplemental jurisdiction over Article 78 claims.</u>

The Second Circuit has not decided "whether Article 78 can, on its own, deprive a federal court of jurisdiction over claims brought under that provision." *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 155 (2d Cir. 2013). Courts in this Circuit are of two minds. One line of cases looks to the state statutory text to conclude that "New York State has not empowered the federal courts to consider such claims." *Blatch ex rel. Clay v. Hernandez*, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005); *Garofalo v. City of New York*, No. 22-cv-7620, 2023 WL 3792514, at *5 (E.D.N.Y. June 2, 2023) (collecting cases). Another line looks to Congress's conferral of broad supplemental jurisdiction under 28 U.S.C. § 1367 to hear Article 78 claims. *Garofalo*, 2023 WL 3792514, at *6 (E.D.N.Y. June 2, 2023) (exercising removal jurisdiction over plaintiff's Article 78 claim raising embedded Second Amendment issues); *Casale v. Metro. Transp. Auth.*, No. 5-cv-4232, 2005 WL 3466405, at *6 (S.D.N.Y. Dec. 19, 2005) (exercising removal jurisdiction over Article 78 proceeding presenting Fourteenth Amendment and arbitrary-and-capricious

27

claim); *Residents & Fams. United to Save Our Adult Homes v. Zucker*, No. 16-cv-1683, 2017 WL 5496277, at \*13 (E.D.N.Y. Jan. 24, 2017) (exercising removal jurisdiction over federal and state claims).

The Court agrees with the latter camp. The Second Circuit has intimated that the Supreme Court's decision in *City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997), "would suggest" that New York law may not "deprive a federal court of jurisdiction over claims brought under that provision." *Carver*, 730 F.3d at 155. In that case, a developer challenged the denial of a permit by filing a claim under the Illinois Administrative Review Law, a state cause of action for reviewing administrative acts under federal or state law. 522 U.S. at 163–64. After defendants removed the case to federal court, the Supreme Court held that federal district courts could assert jurisdiction. *Id.* It reasoned, as to the state claim, that "[n]othing in § 1367(a)" foreclosed supplemental jurisdiction over claims seeking "review of local administrative determinations." *Id.* at 171.

The same is true here. The Complaint brings numerous federal statutory claims, but it also brings an Article 78 claim for arbitrary and capricious review of the Town of Southampton's Findings Statement. (*See* Compl. ¶¶ 132–75.) The Court has original jurisdiction over the federal claims, which "aris[e] under" federal law. 28 U.S.C. § 1331. Accordingly, I may also exercise supplemental jurisdiction over the Article 78 claim under 28 U.S.C. § 1367(a) because it shares a common "nucleus of operative fact" with the remaining claims: the denial of Concern's change-of-zone application. *City of Chicago*, 522 U.S. at 157; 28 U.S.C. § 1367(a). And while New York State may specify how Article 78 claims proceed in its own courts, its requirement that such petitions "shall be brought" in state courts has "nothing to do with whether the proceeding falls within a federal jurisdictional statute." *Garofalo*, 2023 WL 3792514, at \*5 (quoting *Casale*,

28

2005 WL 3466405, at *6). As the *Garofolo* court explained, such an interpretation would enable "state legislatures" and "not Congress" to "control the power of the federal judiciary." *Id.* (quoting *Residents & Fams.*, 2017 WL 5496277, at *13). Yet state courts "have no power to enlarge or to contract the federal jurisdiction." *Grand Bahama Petrol. Co. v. Asiatic Petrol. Corp.*, 550 F.2d 1320, 1325 (2d Cir. 1977) (citation omitted); *see also Anthology, Inc. v. Tarrant Cnty. Coll. Dist.*, 136 F.4th 549, 553 (5th Cir. 2025). Because only Congress and the Constitution may delimit the Court's jurisdiction, Article 78 cannot divest it of the power to hear Concern's Article 78 claim.

     B.  <u>The Court chooses to exercise supplemental jurisdiction over Concern's Article 78 proceedings here.</u>

As noted, in 28 U.S.C. § 1367(a), Congress provided that where a federal court has original jurisdiction over claims in an action, the court "*shall* have supplemental jurisdiction over all other" related claims that are part of the same case or controversy. *Id.* (emphasis added). However, just because one can do something does not mean one should. So, Congress provided that even where a federal court has supplemental jurisdiction over a claim under Section 1367(a), it "*may* decline to exercise supplemental jurisdiction over [that] claim" if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added). Balancing these factors, a court must also weigh the values of "judicial economy, convenience, fairness, and comity." *Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006).

Federal courts disagree over whether they should, as a matter of discretion, exercise supplemental jurisdiction over an Article 78 claim under 28 U.S.C. § 1367(c). Some federal

29

courts decline jurisdiction on grounds that New York has expressed a "preference for" a mode of procedure that "is designed to facilitate a summary disposition of the issues presented." *Carver*, 730 F.3d at 155; *see, e.g.*, *Camacho v. Brandon*, 56 F. Supp. 2d 370, 380 (S.D.N.Y. 1999) (declining to litigate Article 78 arbitrariness claim in federal court to preserve state procedural rules in that scheme). Others disagree, reasoning that severing Article 78 claims from claims over which there is original jurisdiction "would run contrary to the interests of judicial economy" and risk "duplicative litigation." *Garofalo*, 2023 WL 3792514, at *6 (doing so where plaintiff raised Article 78 claim to present federal constitutional claims); *Residents & Fams.*, 2017 WL 5496277, at *13 (exercising supplemental jurisdiction over Article 78 claim containing federal claims as well as state-law claims derived from common nucleus of operative fact).

Here, the Section 1367(c) factors weigh strongly in favor of this Court's exercise of supplemental jurisdiction over Concern's Article 78 claim pursuant to Section 1367(a). With respect to the third Section 1367(c) factor, none of the claims over which this Court has original jurisdiction are dismissed; rather, the federal claims survive Defendants' Rule 12(b)(6) motion for the reasons already explained.

Moreover, with respect to the first Section 1367(c) factor, it does not appear, and Defendants do not suggest, that Concern's challenge to the Town Board's Findings Statement as arbitrary and capricious would present novel or complex issues of state law. The claim focuses on whether the Findings Statement contradicts Concern's Final EIS (Compl. ¶ 173), a primarily factual assessment of the magnitude of the adverse environmental impacts presented on the record. And that question requires the Court to assess whether the Town Board made a decision "without sound basis in reason" or "without regard to the facts." *Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1*, 34 N.Y.2d 222, 231 (1974). Answering that question does not disturb

unexplored areas of state law, as far as the Court can tell. *See Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 616 (S.D.N.Y. 2016) (finding factual question of whether plaintiffs fell within class definition "more factual than legal" and therefore favoring exercise of supplemental jurisdiction).

Nor would the Article 78 claim predominate over Concern's federal claims—the second Section 1367(c) factor. The claims cohere: the legitimacy of the Findings Statement informs whether Defendants acted based on environmental concern rather than discriminatory animus. *See, e.g.*, *Chestnut Hill NY, Inc. v. City of Kingston*, No. 23-cv-1024, 2024 WL 3415116, at *10 (N.D.N.Y. July 15, 2024) (collecting cases that looked to credibility of municipality's decision in inferring discriminatory intent). The converse is also true: whether Defendants made housing unavailable on the basis of disability in violation of the FHA, for instance, may require the Court to judge the "pretextual nature of the[ Town Board's] environmental findings." (Compl. ¶ 107.) The shared locus between Concern's federal claims and its Article 78 claims suggests that severing the Article 78 claims from this action would "run contrary to the interests of judicial economy" by requiring two similar, if not identical, assessments of a complex administrative record. *Garofalo*, 2023 WL 3792514, at *6.

Finally, Defendants contend that exceptional circumstances counsel against the exercise of supplemental jurisdiction over the Article 78 claims because such claims are normally handled under "specific procedure[s] for" special "summary proceeding[s]" in state court. (*See* Mot. to Dismiss at 11 n.9.) Defendants do not explain why it would be difficult for this Court to implement such summary procedures. Nor do they address whether the Rules Enabling Act, 28 U.S.C. § 2072, would preempt any state rules setting forth the summary procedures used to adjudicate Article 78 claims. Nevertheless, even assuming that this fourth Section 1367(c) factor

disfavors Concern, it does not mandate dismissal of the Article 78 claims from this action. The Court recognizes that Article 78 "reflects a state preference for a state mode of procedure" offering plaintiffs "a fast and cheap way to implement a right." *Carver*, 730 F.3d at 155. But *Carver* clarified that such an interest bears on "whether the district court abused its discretion in deciding" to exercise supplemental jurisdiction "where *other factors, too,* strongly support declining that jurisdiction." *Id.* (emphasis added). Here, all three of the remaining Section 1367(c) factors weigh strongly in favor of this Court's exercise of supplemental jurisdiction over the Article 78 claims under Section 1367(a) because federal claims remain in this action, Concern's state and federal claims implicate overlapping questions of law, and Defendants fail to identify any novel state law issue implicated by the state law claims. *See Residents & Fams.*, 2017 WL 5496277, at *13 (choosing to exercise jurisdiction because federal and state claims derived from common facts); *Cedar Dev. E., LLC v. Town Bd. of Hurley*, No. 21-cv-289, 2021 WL 3422342, at *7–8 (N.D.N.Y. Aug. 5, 2021) (same).

## III.   Concern's Claims against the Town Board are dismissed.

Under Federal Rule of Civil Procedure 17(b), "an entity is suable in federal court only if it would be suable under the laws of the state where it was created." *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009); *MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010). Defendants contend that the Town Board lacks a separate legal entity from the Town of Southampton itself, so it may not be sued in its separate capacity. Mot. to Dismiss at 20; *Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco*, No. 17-cv-8586, 2019 WL 1368560, at *13 (S.D.N.Y. Mar. 26, 2019) (collecting cases); *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 343–44 (E.D.N.Y. 2010) (same). Concern responds that the Town Board is a separate suable entity because Defendants

32

have not offered evidence that the Town Board lacks "the capacity to be sued under *its municipal charter*." *Edwards v. Arocho*, 125 F.4th 336, 354 (2d Cir. 2024); Opp'n Mot. to Dismiss at 29.

Defendants have the better argument. As an initial matter, Concern brought this action against the Town Board out of apprehension that any discovery requests or awards of relief against the Town of Southampton "would not bind the Town Board." (Hr'g Tr. at 47:17–25.) But Defendants conceded at oral argument that such requests against the Town of Southampton *would* bind the Town Board, mitigating any prejudice from dismissing the claims against it. (*Id.* at 28:9–29:5.) In any case, the Court declines to read *Edwards*—a suit against a municipal department of corrections—to overturn the long-recognized principle in New York Law that town boards—vested with "all the powers" and subject to "all the duties" of a town, N.Y. Town Law § 60—are legally indistinct from the towns they serve. *See, e.g.*, *Town & Country*, 2019 WL 1368560, at \*13; *Soundview*, 725 F. Supp. 2d at 343–44; *Lopiccolo v. Holtsville Fire Dist.*, 244 N.Y.S.3d 163, 167 (App. Div. 2025) (citing *Dish Realty, LLC v. Town of Huntington*, 996 N.Y.S.2d 335, 336 (App. Div. 2014)); *Berean v. Town of Lloyd*, 162 N.Y.S.2d 534, 538–39 (App. Div. 1957).

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part. The Complaint's NYSHRL claims and claims against the Town Board are dismissed, but all remaining claims may proceed as ripe, including Concern's Fair Housing Act, Americans with Disabilities Act, Rehabilitation Act, and Article 78 claims.[6] Finally, the Court exercises

---

[6] Concern's NYSHRL claims are dismissed pursuant to the parties' agreement. (Opp'n Mot. to Dismiss at 16–17.)

jurisdiction over Concern's Article 78 claims under its independent grant of supplemental jurisdiction under 28 U.S.C. § 1367.

In resolving the motion to dismiss, the Court also lifts the stay of discovery. The parties shall contact the assigned magistrate judge for a discovery schedule by March 19, 2026.

Dated: Central Islip, New York
       March 12, 2026

        */s/ Nusrat J. Choudhury*
        NUSRAT J. CHOUDHURY
        United States District Judge